**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 7, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re:  DANIEL DAVID WARREN;
KATHLEEN ANN WARREN, also
known as Kathleen Ann Chalk,

        Debtors.

_____

ADRIAN MATHAI; ZUBIN
MATHAI; OTE DEVELOPMENT
USA, INC.; 9056–0556 QUEBEC,
INC., doing business as OTE Canada,

        Plaintiffs - Appellees,

    v.

DANIEL DAVID WARREN;
KATHLEEN ANN WARREN,

        Defendants - Appellants.

No. 06-4278

---

**APPEAL FROM THE TENTH CIRCUIT**
**BANKRUPTCY APPELLATE PANEL**
**(BAP NO. UT-05-025)**

---

Sherilyn A. Olsen (Mona L. Burton with her on the brief), Holland & Hart LLP,
Salt Lake City, Utah, for Defendants - Appellants.

Jerome Romero, Jones, Waldo, Holbrook & McDonough, PC, Salt Lake City,
Utah (Michael Jason Lee, Law Offices of Michael Jason Lee, Irvine, California,
with him on the brief), for Plaintiffs - Appellees.

---

Before **HARTZ**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

Adrian and Zubin Mathai were once business associates of Daniel and Kathleen Warren. After they had a falling out, the Mathais sued the Warrens and vice versa. Before the litigation got very far, the Warrens filed for bankruptcy under Chapter 7 of the Bankruptcy Code. Their filings indicated that they had essentially no assets available for creditors. Skeptical, the Mathais filed a complaint to prevent the Warrens from obtaining a discharge in bankruptcy on the grounds that the Warrens had transferred and concealed property to "hinder, delay, or defraud" creditors, 11 U.S. C. § 727(a)(2)(A), and had "made a false oath or account" in the bankruptcy proceeding, *id.* § 727(a)(4)(A). The bankruptcy court agreed with both grounds and denied a discharge. The Warrens appealed to the Tenth Circuit Bankruptcy Appellate Panel (BAP), which affirmed the denial of a discharge under § 727(a)(2)(A) and did not reach the § 727(a)(4)(A) claim. The Warrens now seek relief in this court, but we agree with the BAP. On the record before it the bankruptcy court could properly find that the Warrens had engaged in a variety of unreported or otherwise deceitful transactions whose overriding purpose was to prevent the Mathais from recovering any money from the Warrens' bankruptcy estate.

## I. BACKGROUND AND PROCEEDINGS BELOW

We begin with a brief history of the Warrens' business relationship with the Mathais, which suggests the Warrens' motivation for their actions. Mr. and Mrs. Warren are both certified public accountants. He was licenced in 1985 and has 11 years' experience with Big Five accounting firms. She was licensed in 1989. In 1998 Mr. Warren, through his company, General Business Services, began performing accounting services for SyPRO, LLC, owned and operated by brothers Adrian and Zubin Mathai. SyPRO helped webmasters charge customers for internet usage through credit-card billings. It processed the transactions through a merchant account, an account with a bank that provides a business with the means to handle credit-card transactions. The customer paid SyPRO; after deducting its share of the payment, SyPRO would remit the balance to the website owner.

In March 1999 SyPRO lost its merchant account, and SyPRO and Adrian Mathai were placed in MasterCard's Terminated Merchant File. This halted all SyPRO's business activity. Mr. Warren proposed the creation of a new company, GloBill.com, LLC. As the bankruptcy court observed, GloBill was formed with the purpose of "carry[ing] on SyPRO's business, resolv[ing] the merchant account issue, and conceal[ing] the Mathai Brothers' affiliation with the merchant account process." Mem. Decision (Bankr. Op.) at 4, Mar. 28, 2005 (Aplt. App. Vol. 1 at 31). (Citations to the Bankr. Op., Aplt. App. Vol. 1 at 28–67, will refer to pages

of the decision rather than pages of the appendix.) Mr. Warren was managing member and chief executive officer, Mrs. Warren was chief financial officer, Adrian Mathai was director of operations, and Zubin Mathai served as senior programmer. On paper Warren Associates owned GloBill. But according to the Mathais, Mr. Warren had advised them that they were the true owners, that all invested funds were subject to Adrian's oversight, and that the Warrens' involvement was solely for administrative purposes. The Mathais were granted a permanent option to acquire 95% of GloBill.

Although GloBill's customer base was growing, by August 2002 Mr. Warren notified the Mathais that it was experiencing severe cash shortages. The Mathais claimed that Mr. Warren demanded that they make cash contributions to cover operating expenses and repeatedly threatened to take GloBill into bankruptcy if the deposits were not made. The Mathais became suspicious of the Warrens' management of GloBill and hired a private investigator to pose as a prospective purchaser of the company. Based on the investigator's report, the Mathais concluded that the Warrens were embezzling money from GloBill, including $1.3 million that belonged to webmasters for whom GloBill processed online payments.

On September 26, 2002, the Mathais filed suit in Pennsylvania state court, asserting various claims (apparently including fraud, conversion, and breach of contract) against the Warrens. Also, as GloBill's administrators they began to

-4-

redirect its revenues to an off-shore account, effectively stopping GloBill's cash flow. Although the Mathais allege that on September 27, 2002, they exercised their option to purchase GloBill, Mr. Warren caused GloBill to sue the Mathais in October 2002 in federal court in California for, among other things, damages and an injunction barring them from diverting GloBill's revenue. The Mathais voluntarily dismissed their complaint in Pennsylvania, choosing instead to assert their claims as third-party claims against the Warrens in the California litigation.

On March 16, 2004, about four months before the California trial was set to begin, the Mathais and Warrens met with a magistrate judge for a settlement conference. The Warrens had already incurred substantial legal expenses and anticipated that they would not be able to continue to pay for the litigation. They offered to pay the Mathais $100,000 and drop all their claims in return for the dismissal of all claims against them. The Mathais rejected the offer; Mrs. Warren was frustrated and upset.

Perhaps at the suggestion of the magistrate judge, the Warrens met with bankruptcy counsel two or three days later. The lawyer explained that if they filed for bankruptcy, certain assets would be surrendered to a trustee for liquidation to pay creditors and certain assets would be exempt and thus not seized. According to the bankruptcy court, Mrs. Warren "did not believe that [the Warrens] owed the Mathai Brothers and she did not want any of their assets liquidated by the chapter 7 trustee to pay the disputed claim." Bankr. Op. at 8.

By the time the Warrens filed their Chapter 7 petition on April 22, it appeared that this goal had been accomplished. During the prior months they had sold various assets, spent about $116,000, acquired assets exempt from creditors' claims, and left themselves with $20 cash on hand. We now describe the Warrens' relevant financial transactions in more detail.

In late December 2003, before the settlement conference and the meeting with bankruptcy counsel, the Warrens refinanced their 6,000-square-foot home; about $77,000 went directly to credit-card companies, and they received $48,000 in cash. The Warrens testified that they used most of the cash to pay the California attorneys, leaving them with $11,000. On March 29, 2004, the Warrens purchased a more modest home for $169,000 under a real-estate-purchase contract with the seller, Brooke Roney. They made a $5,000 cash down payment and received a $25,000 credit toward the purchase price by transferring a portion of the Warrens' collection of coins to Roney's brother, Burke (more on the coin collection later). As part of the agreement, Brooke agreed to spend $5,000 on repairs. The Warrens also spent $3,000 to $5,000 in repairs.

After meeting with bankruptcy counsel in March 2004, the Warrens obtained additional cash by selling various personal property in arms-length transactions not questioned by the Mathais. On March 22 they sold a 2001 GMC truck for $13,000. Eight days later they sold two more vehicles for $20,500.

Between April 13 and 17 they sold jewelry for $500, a piano for $1,419, and miscellaneous property for $1,905.

What the Warrens did with the cash from the above transactions (plus essentially all their cash from bank accounts) appears less innocent. In particular, during the month preceding their bankruptcy filing they prepaid about $15,000 in expenses. The prepayments included $900 in 2004 property taxes and $4,080 for four months of real-estate-contract payments on their new home; over $5,000 in health insurance premiums for a family policy; $977 for dental insurance; $400 in health insurance premiums for Mr. Warren's mother; $1,500 for home and auto insurance; and $1,500 in prepaid malpractice premiums. The Warrens also prepaid creditors including Questar ($240.37), Provo Utilities ($389.89), Qwest ($10.45), and Chase Manhattan Bank ($145.51). Such prepayments were unusual for the Warrens. Although the Warrens, as CPAs, surely knew that the prepayments were assets (at trial they both acknowledged that they knew that prepayment of insurance was an asset), the prepayments were not listed on their original schedules filed with the bankruptcy court on May 7, 2004. The prepayments were uncovered in late June when the Mathais conducted an examination of the Warrens' finances, *see* Fed. R. Bankr. P. 2004. And not until July 16—after the Mathais had filed their complaint seeking denial of the Warrens' discharges—did the Warrens amend their schedules to reflect payments to 12 creditors; even then, the prepayments were not reported as assets (but only

-7-

as payments to creditors) and the $400 prepayment of health insurance for Mr. Warren's mother (a gift, not an asset) and $900 prepayment of 2004 property taxes were still not reported in any fashion. The Warrens were later refunded some of the prepayments, including $300.27 in refunded property taxes when they returned their new home to Brooke Roney for $10,000 in September 2004.

Much of the cash obtained by the Warrens was used to acquire assets that they then apparently undervalued so that they would come within the statutory limits for exempt property. Utah law permits a debtor to claim an exemption for a motor vehicle, but only up to $2,500. *See* Utah Code Ann. § 78-23-8(3). The Warrens' May 7, 2004, bankruptcy schedule listed two vehicles (one for each of them) as exempt, one valued at $1,000 and the other at $2,500. Yet they purchased the "$1,000" vehicle on March 22 for $1,100 and spent $2,050.80 on April 9 for vehicle repairs and improvements. Likewise, they bought the "$2,500" vehicle on March 25 for $2,700 and between March 30 and April 4 spent an additional $2,776.65 for repairs and improvements. Thus, they valued the two vehicles at a total of $3,500 despite having spent $8,600 on them in the prior seven weeks. It is also worth noting that the Warrens used some of their accumulated cash to purchase items protected from creditors by Utah's uncapped exemption for "provisions sufficient for 12 months actually provided for individual and family use." *Id*. § 78-23-5(1)(a)(viii). During the month before

-8-

filing their bankruptcy petition they spent $3,000 on groceries, $2,000 on clothes, and $2,000 on a mattress.

The Warrens' apparent undervaluing of assets to keep them under the statutory caps extended to assets acquired before the Warrens met with bankruptcy counsel. For example, Utah Code Ann. § 78-23-8(2) provides a $3,500 exemption for "implements, professional books, or tools of [the] trade." Under this provision the Warrens claimed as exempt 14 computers, which they valued at $200 in total despite having paid $31,000 for the used computers seven months earlier. Section 78-23-8(1)(d) provides a $500 exemption for "heirlooms or other items of particular sentimental value." Under this exemption they claimed "wedding rings" valued at $10, a pearl necklace valued at $2.00, a gold ring valued at $3.00, a chair from Spain valued at $0.00, and five paintings valued at a total of $10.00. Section 78-23-8(1)(a) provides a $500 exemption for "sofas, chairs, and related furnishings reasonably necessary for one household." Under this exemption the Warrens claimed over 30 items, including 6 TVs valued at $50 total, china valued at $1.00, crystal valued at $1.00, a stereo valued at $5.00, and a treadmill and stairmaster valued at $20.00 total. As a result, the Warrens' only nonexempt tangible property consisted of sports, camping, and yard equipment; household tools; a third automobile; and a few pieces of furniture.

The conduct on which the bankruptcy court's ruling most relied related to the Warrens' coin collection. Mr. Warren testified at trial that he had collected

coins all his life and began selling them at the end of 2002.  According to the schedules submitted by the Warrens, in 2002 he sold coins for $11,032.41, at a profit of $2,907.87, and in 2003 he sold coins for $112,171.14, at a profit of $549.44.  Apparently he had bought many of the coins on E-Bay.  In 2004, however, during the four months before filing for bankruptcy he sold the remainder of the collection (including coins purchased for $15,000 in February 2004) for only $52,434.73, at a *loss* of $46,160.97.  One of those sales occurred about two weeks after first consulting with bankruptcy counsel; Mr. Warren transferred coins to Burke Roney for a $25,000 credit toward the purchase of the new home from Burke's brother Brooke.  Although Mr. Warren told Burke that the coins were worth $25,000, he had spent $50,000 to acquire them. Mrs. Warren testified that she had maintained a QuickBooks register to record coin transactions and the revenue generated, but the Warrens failed to describe, in their bankruptcy schedules or other documents, "when, where, for what amount, or to whom the . . . coins were sold."  Bankr. Op. at 10.  Mr. Warren testified that he kept no inventory or bill of sale for the coin transaction with Burke Roney.

At trial the Warrens denied any intent to conceal property or to hinder or defraud creditors.  As summarized by the bankruptcy court, they explained that when they made various sales and purchases just before filing "they were simply trying to position themselves to support their family and grow their new business post-petition."  *Id*. at 28.  They excused the errors on their forms on the grounds

-10-

that (1) Mr. Warren was busy because it was tax season and (2) they both were busy preparing bankruptcy filings for two entities and contemplating a third. And they argued that in any event their July amendments to their schedules cured any previous errors.

The bankruptcy court was not persuaded. Rejecting the Warrens' explanation for their various transactions, it said: "[T]he Warrens readily obtained employment just after filing for bankruptcy protection at wages more than sufficient to meet their family expenses. This tends to prove that their alleged panic about being able to provide for their family post-petition was . . . not credible." *Id.* at 29. And the bankruptcy court saw no innocent explanation for the Warrens' failure to report their transactions properly in their bankruptcy schedules. The court said that their excuses "do not ring true" and that there was significant evidence that the "omissions were intentional and designed to defraud." *Id*. at 33. It explained:

> Mr. Warren excuses the omissions by explaining that the bankruptcy documents were prepared during tax season, yet Mr. Warren failed to offer any evidence that he was, in fact, busy preparing tax returns and consequently could not focus on the accuracy of his bankruptcy papers. His accountancy specialty lies in tax compliance and planning but he testified he billed his clients on a flat monthly fee for accounting work. Mrs. Warren indicated she simply was not thinking of some of the payments that had been made and the omissions were inadvertent. Neither debtor made an excuse for the omissions of the coin transactions. . . .
>
> The Debtors testified that Mr. Warren met numerous times with their attorney and that Mrs. Warren made multiple calls to

discuss the Schedules with their attorney, so they cannot argue they did not understand what information to include in the [Schedule of Assets] and the Schedules. The Warrens have technical training as accountants and as such, admit that they understand that prepaid insurance is an asset. . . . Unlike a debtor who is inexperienced with financial affairs or one who relies on incorrect advice or information in preparing his statements and schedules, the Warrens are sophisticated debtors—each with degrees in accounting and significant finance experience.

The Warrens keep meticulous records including detailed paper and computer records of their financial affairs that should have provided the answers necessary to accurately complete their bankruptcy documents. A simple sort of the computer data will indicate payments made within 90 days of filing. For those numerous transactions made by the Warrens in cash and allegedly not recorded in their computer program (an odd circumstance for transactions involving large sums of money), they eventually produced a large quantity of cash register receipts and other data including items so small as a cash receipt for $10.61 for the purchase of nose hair trimmers. The evidence indicates the information was available to assist the Warrens in compiling their papers. They prepared a list of creditors which amounts to four and a quarter inches thick stack of paper so that all possible contingent debt would be included in their discharge. The Debtors knew how to be inclusive and were quite accurate when it suited them.

The assertion that the Debtors were either too busy or just forgot to list their coin transactions or the payments to creditors is simply not credible. They sold their coin collection at a drastic loss, unlike the transactions in prior years. The sale was made, in part, to fulfill their desire to purchase a new home with equity for a homestead exemption. Just prior to filing, the Warrens converted almost every asset they could into cash and spent significant amounts in a calculated effort to maximize every exemption to which they were entitled. In just one day, three days prior to filing, they made purchases at eight different stores. They prepaid insurance, mortgage payments, taxes, and utilities in a manner they had never done before. All in all, these were extraordinary transactions in every respect. The Warrens cannot credibly argue that the matters were so

routine they forgot to list them. Nor can they argue that the transactions were so remote in time that they forgot.

*Id*. at 33–35 (footnotes omitted). The court also rejected the claim that the amendments to the Warrens' original schedules cured any errors. It found the "timing of the [a]mendments . . . suspect," *id* at 35, because they occurred only after the Mathais discovered the transactions, and even then over three weeks later, after the Mathais had filed their complaint. Furthermore, the amendments left some transactions still undisclosed. The court found the Warrens' evaluation of assets to be "suspect," Bankr. Op. at 25, but not sufficient in itself to establish fraudulent intent.

The BAP upheld the bankruptcy court's ruling, concluding that the "bankruptcy court's decision to deny [the Warrens'] discharges pursuant to § 727(a)(2)(A) [was] so thorough and compelling" that it "affirm[ed] on that ground alone, finding no need to address [the Warrens'] arguments under § 727(a)(4)." *In re Warren*, 350 B.R. 628, at *1 (B.A.P. 10th Cir. 2006). The Warrens' opening brief in this court addresses only § 727(a)(2)(A). The Mathais' brief responds to the Warrens' arguments and also advocates affirmance under § 727(a)(4). The Warrens' reply brief challenges the bankruptcy court's ruling under § 727(a)(4); but we need not address that issue.

## II.    DISCUSSION

This is an appeal from a BAP decision.  *See* 28 U.S.C. § 158(d)(1).  As we have stated, however, "we review only the Bankruptcy Court's decision." *In re Alderete*, 412 F.3d 1200, 1204 (10th Cir. 2005).  By this we do not mean that we ignore the procedural posture of the case before us—an appeal from a BAP decision.[1]  Rather, we mean that we treat the BAP as a subordinate appellate tribunal whose rulings are not entitled to any deference (although they certainly may be persuasive).  We review matters of law de novo, and with respect to factual findings (which are made only by the bankruptcy court, not the BAP), we review for clear error.  *See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).  Also, "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor." *Id.*

Under 11 U.S.C. § 727(a)(2)(A) a bankruptcy court may deny a debtor a discharge when "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the

---

[1]Thus, contrary to the suggestion in the Mathais' answer brief, the Warrens had no obligation to address in their opening brief a ground for the bankruptcy court's judgment that was not adopted by the BAP.  Failure of the Warrens' opening brief to address the bankruptcy court's denial of a discharge under 11 U.S.C. § 727(a)(4) was not a waiver of their arguments on that issue, and they properly could first address it in their reply brief's response to the Mathais' arguments in their answer brief. *Cf. Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) (court affirms on district court's alternative ground for judgment that was not addressed in appellant's brief).

debtor, within one year before the date of the filing of the petition." In *Gullickson*, 108 F.3d at 1292, we explained that a party objecting to a discharge under this section "must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor." The Warrens do not challenge on appeal the first three requirements, making "[t]he pivotal issue in dispute in this case . . . [the Warrens'] intent," Bankr. Op. at 20.

"To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors." *Marine Midland Bus. Loans, Inc. v. Carey* (*In re Carey*), 938 F.2d 1073, 1077 (10th Cir. 1991). Because rare is the occasion when a party lays bare his or her subjective intent, "[f]raudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

One of the more difficult issues in bankruptcy law is deciding when, if ever, an intent to defraud creditors can be shown by the debtor's conversion of nonexempt assets to exempt assets. Any such conversion is highly likely to harm creditors because it removes their access to some of the debtor's wealth. But the very purpose of having exemptions is to permit a debtor to retain certain necessities (although one could dispute whether exemptions are limited to

-15-

necessities) without fear of creditors taking them. Thus, as Judge Richard Arnold wrote in an oft-noted dissent, "A debtor's right to make full use of statutory exemptions is fundamental to bankruptcy law." *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 877 (8th Cir. 1988) (Arnold, J., dissenting). He therefore concluded (in a concurrence in a companion case) that "[the debtor's] avowed purpose to place the assets in question out of the reach of his creditors [by using statutory exemptions is] a purpose that, as a matter of law, cannot amount to fraudulent intent." *Hanson v. First Nat'l Bank*, 848 F.2d 866, 870 (8th Cir. 1988) (Arnold, J., concurring). He expressed the view that finding such intent "based on subjective considerations that will vary more widely than the length of the chancellor's foot" simply "is not a rule of law." *Id.* at 871. But Judge Arnold's view has not universally prevailed. Accordingly, bankruptcy lawyers can face a dilemma in advising clients whether to acquire exempt assets. As one commentator observed, "[T]he same conduct can be malpractice *not* to advise in one jurisdiction, but voidable and grounds for denial of discharge and possibly for disbarment in another . . . ." John D. Ayer, *How to Think About Bankruptcy Ethics*, 60 Am. Bankr. L. J. 355, 374 (1986).

This circuit has not joined Judge Arnold's camp. To be sure, our opinion in *Carey* "start[ed] with the premise that 'the conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise

would be entitled,'" 938 F.2d at 1076 (quoting *Tveten*, 848 F.2d at 873–74). But

our quoting the majority opinion in *Tveten*, rather than Judge Arnold's dissent,

suggests that the "more" that would permit denial of the exemption (or even

discharge) may be no more than evidence regarding the acquisition of exempt

property, because the basis for finding fraudulent intent in *Tveten* was merely that

"the debtor liquidated almost his entire net worth of $700,000 and converted it to

[exempt] property . . . on the eve of bankruptcy," 848 F.2d at 876. Moreover, we

said in *Carey* that "[a]ctions from which fraudulent intent may be inferred include

situations in which a debtor . . . converts assets immediately before the filing of

the bankruptcy petition," 938 F.2d at 1077 (citations omitted); and we noted that

"[o]ther indicia of fraud include: (1) that the debtor obtained credit in order to

purchase exempt property; (2) that the conversion occurred after entry of a large

judgment against the debtor; . . . and (4) that the conversion rendered the debtor

insolvent," *id.* at n.4 (brackets and internal quotation marks omitted).

Emphasizing the scope of the trial court's fact-finding discretion, we added: "The

cases . . . are peculiarly fact specific, and the activity in each situation must be

viewed individually." *Id.* at 1077.[2]

---

[2]The recent amendments to the Bankruptcy Code do not apply to this case. But we note that Congress apparently has now taken the view that a conversion from nonexempt to exempt property may be taken with fraudulent intent. *See* 11 U.S.C. § 522(c) (denying exemptions for portions of certain exempt property "attributable" to nonexempt property disposed of with the intent to hinder, delay, or defraud a creditor); H.R. Rep. No. 109-31(I) at 16, 72–73, 594 (2005) (discussing provision).

(continued...)

Because *Carey* affirmed the bankruptcy court's ruling that the debtor was entitled to the claimed exemptions, it is of limited value in determining what is necessary to establish fraud. But an earlier circuit precedent is instructive. In *Mueller v. Redmond* (*In re Mueller*), 867 F.2d 568 (10th Cir. 1989), we affirmed a ruling that a life-insurance policy claimed to be exempt had been acquired with fraudulent intent. We held that the bankruptcy court's finding was supported by the following badges of fraud:

> (1) the debtor was insolvent when he purchased the policy; (2) the policy was purchased one week prior to the filing of his petition in bankruptcy; (3) the debtor used his last non-exempt assets to make the acquisition; (4) the debtor had two other unencumbered life insurance policies; (5) although the debtor contended he purchased the last policy to provide for his daughter's education, the named beneficiaries are the "then living children of the insured, and the then living children of any child of the insured who is not then living, per stirpes."

*Id.* at 570. The bankruptcy court was applying a state statute that denied the life-insurance exemption if the policy "was obtained by the debtor for the purpose of defrauding . . . the debtor's creditors," *id.* at 569 (internal quotation marks omitted); but the grounds for finding fraudulent intent would appear to be the same under § 727(a)(2), as shown by the citation to *Mueller* in *Carey* for the proposition that fraudulent intent under § 727(a)(2) can be inferred when the

---

[2](...continued)

debtor "converts assets immediately before the filing of the bankruptcy petition," *Carey*, 938 F.2d at 1077.

Although our decision in *Mueller* could support a finding of fraudulent intent based on the Warrens' frenzy to convert all their assets to exempt assets in the month before filing for bankruptcy, we are most reluctant (for the reasons expressed by Judge Arnold) to recognize a conversion of nonexempt assets to exempt assets as fraudulent, and we need not do so to affirm the BAP decision in this case. The bankruptcy court described a variety of conduct that supports its finding of fraudulent intent. That conduct includes the Warrens' failure to disclose their prepayments as assets; the peculiar transaction to acquire a new homestead (and return it within months); their motivation to keep the Mathais from obtaining anything through the bankruptcy proceedings; their willingness to engage in shady dealing in prior business transactions (such as concealing the true ownership of GloBill); and, of greatest significance to the bankruptcy court, the irregular coin transactions. For the Warrens to sell their collection at barely half its cost just before filing for bankruptcy, when they had profits (although slight) in the immediately preceding years, suggests (1) an effort to keep creditors from realizing the full value of their collection or (2) failure to report accurately how they disposed of the collection, an inference suggested by the absence of detailed records of the transactions, which the Warrens could be expected to have kept. In addition, the bankruptcy court had the opportunity to assess the Warrens'

-19-

credibility and character as they testified about their conduct and motives. The court observed that at trial Mr. Warren attempted to "word-smith his answers to avoid being caught in a deception" and that Mrs. Warren's testimony "was inconsistent in several significant respects." Bankr. Op. at 19, 29. In particular, the bankruptcy court was entitled to disbelieve the Warrens' assertions that their motive was simply to provide for their family during a difficult transition, that they relied on the advice of bankruptcy counsel, and that Mrs. Warren was ignorant of, and did not join in, any fraudulent conduct.

*Gullikson*, 108 F.3d 1290, on which the Warrens rely, is readily distinguishable. In that case the bankruptcy court denied the debtor a discharge under § 727(a)(2) because (1) he transferred a security interest in an antique car collection four days before filing for bankruptcy; (2) he retained possession and use of the automobiles; (3) the valuations of his assets differed on his prepetition financial statements and his bankruptcy schedules; (4) he failed to list one of his antique cars on his bankruptcy schedules; and (5) he failed to keep records of the antique-car collection. *Id.* at 1293–94. Reversing, we said that the evidence surrounding each alleged badge of fraud undermined an inference of fraud: (1) the debtor transferred a security interest in his antique cars to obtain a cash infusion for his business, which was his sole source of income, and "[t]here was no evidence that the money was not reasonably used or that it was squandered," *id.* at 1293; (2) there was nothing inappropriate in maintaining possession of a vehicle

in which someone else had acquired a security interest in an arm's-length transaction; (3) the decrease in valuation of assets reported in prior financial statements was largely accounted for by business reversals and the inclusion of his wife's assets in the prior statements; (4) the debtor promptly reported the omitted vehicle at the creditors' meeting before anyone else had noted the absence; and (5) the car collection was a hobby, and failure to keep records was justified in the circumstances. We see nothing comparable in the record in this case: The Warrens' transactions immediately before filing for bankruptcy could not have been intended to augment their business income; they corrected omissions in their schedules only after the Mathais pointed them out; and even if the Warrens' coin collection was only a hobby (although they started a sole proprietorship called "Treasure Coins," and referred to it as a business on several occasions), they acknowledged preparing records of each transaction but failed to supply such records in the bankruptcy proceedings.

The BAP properly affirmed the bankruptcy court's denial of discharge under 11 U.S.C. § 727(a)(2).

III. CONCLUSION

We AFFIRM the decision of the Bankruptcy Appellate Panel.