**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 28, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: GALEN LEMAR AMERSON,
officer, director, shareholder BOS, Inc.,
member See the Signs, LLC; FRANCES
MOORER SCOTT, officer, director,
shareholder BOS, Inc., member
Experimental Learning Tools, LLC,
member TWP LLC, former member See
the Signs, LLC, member Clear & Free,
LLC, member Gappe, LLC,

      Debtors.
------------------------

FRANCES MOORER SCOTT,

      Appellant,

v.

DENNIS W. KING, Chapter 7 Trustee;
BETTY QUINN MOORER, SEALE E.
MOORER, JR.; TAMARA D. MOORER,

      Appellees.

No. 15-1343

---

**APPEAL FROM THE BANKRUPTCY APPELLATE PANEL**
**(BAP No. 14-045-CO)**

---

Edward Levy of Atlas Law Firm, P.C., Denver, Colorado (Logan R. Martin and Zachary
S. Westerfield of Westerfield & Martin, Denver, Colorado, with him on the briefs), for
Appellant.

Douglas C. Pearce, II, of Connolly, Lofstedt, Cadette & Pearce, P.C., for Appellee, Dennis W. King, Chapter 7 Trustee.

Before **KELLY, BRISCOE** and **GORSUCH**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Frances Moorer Scott, along with her husband Galen Amerson, filed for Chapter 7 bankruptcy protection. Scott ultimately amended her bankruptcy petition to identify as an asset her interest in a Florida state action that she and her half-sister had filed contesting the legitimacy of their father's will. The trustee retained Florida counsel, who in turn reached a tentative settlement of the ongoing probate contest. The trustee then moved the bankruptcy court to approve the settlement agreement. The bankruptcy court granted the trustee's motion over Scott's objection and approved the settlement agreement. Scott appealed to the Tenth Circuit Bankruptcy Appellate Panel (BAP), which affirmed the bankruptcy court's decision. Scott now appeals from the BAP's decision.

At issue is whether Scott's interest in a spendthrift trust created by her late father was properly treated as property of the bankruptcy estate, or if that interest was excluded from the estate pursuant to 11 U.S.C. § 541(c)(2).

Exercising jurisdiction pursuant to 28 U.S.C. § 158(d)(1), we conclude that the exception set forth in § 541(c)(2) is permissive, not mandatory, and that Scott's inclusion in her bankruptcy schedules of her interest in the probate contest, combined with her

2

failure to argue for application of the § 541(c)(2) exception, resulted in that interest becoming part of her bankruptcy estate. We therefore affirm BAP's decision.

I

*The Debtors*

Galen Amerson and Frances Scott (jointly, Debtors) are spouses and Colorado residents. On April 13, 2012, Debtors filed a voluntary petition for Chapter 7 relief in the United States Bankruptcy Court for the District of Colorado.

*The 1983 and 2012 Wills*

On February 7, 2012, Scott's father, Seale A. Moorer, Sr. (Moorer), died leaving a last will and testament dated January 9, 2012 (the 2012 Will). The 2012 Will was a "pour-over" will that transferred any assets that Moorer held outside of trust to a revocable or living trust that was created simultaneously with the 2012 Will in order to avoid probate of Moorer's assets. App. at 406. The 2012 Will purportedly superseded an earlier will executed by Moorer in 1983 (the 1983 Will).

The 1983 Will provided that upon Moorer's death his estate would be divided into two separate trusts: a Marital Trust for the benefit of Scott's mother (assuming that she survived Moorer), and a Family Trust for the benefit of Scott's mother and Moorer's descendants. The Family Trust authorized the trustee, during the life of Scott's mother, to pay to Moorer's children or more remote descendants as much of the principal as the Trustee deemed necessary for their support, health and education. The Family Trust also provided that, five years after the death of both Moorer and his wife, the trustee was to

3

evenly divide and distribute the remaining trust principal to Moorer's living children and descendants. At the time the 1983 Will was drafted, "the amount of assets that could be transferred to the beneficiaries of the estate without [incurring] a federal estate tax liability was $275,000." Id. at 407.

According to the record, "one of the primary reasons that" Moorer had the 1983 Will redrafted was because, "[i]n 2012, the exemption amount for federal estate tax purposes was $5,120,000, which greatly exceeded the amount of . . . Moorer's assets . . . ." Id. Had the 1983 Will remained in place, "the entire amount of his assets would have been held in the Family Trust, over which [his wife] retained no control." Id. "This was contrary to the intent shown in the 1983 Will[] . . . ." Id.

The 2012 Will "provides that the entire trust estate is to be held in a Marital Trust created for the benefit of [Moorer's wife]" and that she "is entitled to all the net income from the trust, together with all or any part of the trust principal that the Trustee in its discretion considers advisable for her maintenance in health and reasonable comfort, or support in her accustomed manner of living." Id. It also affords her "a limited power of appointment which enables her to appoint any remaining trust principal at her death to whomever she sees fit; provided, however, that this power is not exercisable in [her] favor . . . , her estate, her creditors or the creditors of her estate, for federal transfer tax reasons." Id. "[I]f she fails to exercise her limited power of appointment, any remaining trust principal in the Marital Trust will be disposed of pursuant to [the provisions of Moorer's] Revocable Trust." Id. Under the relevant provisions of Moorer's Revocable

4

Trust, the remaining trust principal would "be divided into two equal shares" on behalf of Scott and her brother, if they are both living, "subject to the provisions of . . . lifetime trust[s] to be established for [their] benefit . . . ." Id. at 408. "These lifetime trusts . . . are designed to be asset protection trusts for the benefit of" Scott and her brother. Id. More specifically, they were designed "to insulate the assets held in the children's trusts from a beneficiary's creditors to the fullest extent permitted by law."[1] Id. "No provision was made for Martha Moorer Wise, . . . Moorer's daughter from a prior marriage," i.e., Scott's half-sister. Id.

*The Debtors' bankruptcy petition*

The Debtors' bankruptcy petition and attached schedules indicated that the Debtors' assets were $46,586.20 and their liabilities, which they described as primarily business related, were $169,221.63. In response to a question on the petition asking them to "[l]ist all suits and administrative proceedings to which [they] [are] or [were] a party within one year immediately preceding the filing of this bankruptcy case," debtors listed four such proceedings: one pending federal case and three state court matters. Id. at 42 (emphasis omitted).

Schedule B to the petition asked the Debtors, in pertinent part, to list and describe any "[c]ontingent and noncontingent interests in [the] estate of a decedent, [a] death benefit plan, [a] life insurance policy, or [a] trust." Id. at 53. Debtors listed no such

---

[1] According to the attorney who drafted the 2012 Will, he was advised that Moorer requested this provision in order "'to protect [Scott] from herself' and that [her brother] should be Trustee of that trust." Id. at 408.

5

interests and instead checked the box indicating "NONE." Id.

With their petition and schedules, Debtors signed and submitted a "DECLARATION CONCERNING DEBTOR'S SCHEDULES" that stated, in pertinent part, that they were declaring under penalty of perjury that their schedules "[we]re true and correct to the best of [their] knowledge, information, and belief." Id. at 80 (emphasis omitted).

*The initial bankruptcy proceedings*

The bankruptcy court appointed Dennis King as trustee. On May 16, 2012, King conducted a meeting of the Debtors' creditors. During that meeting, King questioned Scott regarding the existence of any possible inheritances. Scott, in response, did not disclose Moorer's death or any possible interest in his estate. King informed Scott that she was obligated to let him know if she won the lottery, received any life insurance proceeds, or learned that she was going to inherit money. Scott acknowledged that she understood this obligation.

On August 2, 2012, the bankruptcy court issued an order granting the Debtors' discharge. On October 22, 2012, King issued a no-asset report that was based upon the information obtained from the Debtors' schedules and the meeting of their creditors. On December 5, 2012, the case was closed.

*The probate contest*

In mid-June 2012, after the meeting of creditors but while the Debtors' Chapter 7 bankruptcy proceeding was still pending, Scott and her half-sister Wise hired an attorney

6

to represent them in contesting the 2012 Will.  On June 22, 2012, Scott and Wise, represented by counsel, filed a probate contest in Florida state court against their mother, as well as Scott's brother and his wife.[2]  The probate contest alleged that Moorer lacked "testamentary capacity and was subject to 'undue influence' at the time he executed" the 2012 Will.  Id. at 354.  In particular, the probate contest alleged: (1) that Scott's brother was sitting next to Moorer at the will signing; and (2) that Moorer, immediately following the will signing, was taken to an inpatient memory treatment facility where he died less than one month later.  The probate contest sought to reinstate the 1983 Will or, in the alternative, to have Moorer's estate pass by intestacy.

At no point prior to the December 5, 2012, closure of their Chapter 7 bankruptcy proceedings did Debtors disclose this probate contest to the bankruptcy court or King.

*Scott's Chapter 13 proceeding*

On December 14, 2012, Scott filed a *pro se* Chapter 13 bankruptcy petition.  The schedules and statement of financial affairs attached to the petition did not disclose the pending probate contest or any other interest in Moorer's estate.  On February 25, 2013, Scott amended her statement of financial affairs and Schedule B in this Chapter 13 bankruptcy proceeding to list the probate contest.  In doing so, she valued the probate

---

[2] The probate contest was comprised of two actions: (1) a "Counter Petition for Administration and Petition for [R]evocation of Probate of Will [d]ated January 9, 2012," and (2) a "Complaint for Revocation of Trust dated January 9, 2012 . . . ."  Id. at 132.  According to the record, both actions were treated as part of or otherwise consolidated with the probate proceeding that was filed on February 16, 2012, regarding the administration of Moorer's estate.  Id. at 373.

contest as "Unknown/$0." Id. at 353. In a subsequent hearing before the bankruptcy court regarding her Chapter 13 bankruptcy proceeding, Scott conceded that the probate contest was "going to be a huge financial drain" and might not result in any "asset[s] or any income or anything like that . . . ." Id. at 110.

On March 7, 2013, the bankruptcy court entered an order dismissing Scott's Chapter 13 proceeding as a bad faith filing. During the hearing that resulted in the dismissal, Scott advised the bankruptcy court that her brother had stolen "millions of dollars . . . out of [her] dad's account before he died," and asked the bankruptcy court if she needed to disclose that on her bankruptcy forms. Id. at 117. The bankruptcy court advised Scott that, "with respect to Chapter 7, [she] c[ould] file amended statements or schedules as [she] want[ed]" and that it would "be a function of whether the trustee want[ed] to pursue any of that." Id.

Scott's Chapter 13 case was officially closed on April 18, 2013.

*The Debtors' reopened Chapter 7 proceeding*

On December 28, 2012, Debtors moved to reopen their Chapter 7 bankruptcy case in order to amend their Schedule B to list a claim for wrongful foreclosure against their mortgage lender. Debtors subsequently filed an amended Chapter 7 Schedule B to include their wrongful foreclosure action. On that amended Schedule B, Debtors also listed, under the category of "[o]ther contingent and unliquidated claims of every nature," the "Seale A Moorer - Estate - Probate - Florida - et al" as an asset, but claimed that its value was "unknown $0.00." Id. at 122. Debtors continued to state that they had no

8

"[c]ontingent [or] noncontingent interests in [the] estate of a decedent . . . ." Id.

On March 15, 2013, the bankruptcy court entered an order reopening the Debtors' Chapter 7 bankruptcy proceeding. Shortly thereafter, the bankruptcy court reappointed King to serve as trustee in the proceeding. On April 3, 2013, King withdrew his notice of no-asset report. In doing so, King stated that he had reason to believe that there was a high probability of assets coming into the estate.

On April 5, 2013, Debtors sent a letter to King "attempt[ing] to justify their omission of the [probate contest] in their original bankruptcy schedules." Id. at 355. Debtors alleged that they never expected any "windfalls[] or inheritance that would have had an origination date prior to[] or during" the original pendency of their Chapter 7 proceeding. Id. (quotation marks and citation omitted). The Debtors further alleged that even if Scott was successful in challenging Moorer's 2012 Will, she would not receive any distribution until five years after her mother's death. Lastly, the Debtors alleged that if Scott was unsuccessful in challenging the 2012 Will, Scott would receive a distribution of funds only if her mother chose to allow such a distribution.

Debtors amended their Schedule B form two more times: on May 30, 2013, and again on November 4, 2013. Both of these amendments listed the probate contest, but indicated that it had no value.

On November 7, 2013, King filed a notice of possible dividend, the purpose of which was to notify creditors that there might be money in the estate for distribution. The notice provided creditors with time in which to file claims.

9

After learning of the existence of the pending probate contest, King retained counsel in Florida and, with counsel's assistance, was successfully substituted for Scott in the probate contest. King's counsel attended a court-ordered mediation, which resulted in a settlement of the probate contest. Under the terms of the settlement, King and Scott's half-sister (the plaintiffs in the probate contest) would each receive $100,000 in exchange for releasing all claims. King would also receive $6,000 to pay his fees and expenses related to obtaining approval of the settlement agreement. In exchange for these payments, King agreed to "renounce[] and disclaim[] any and all interests [Scott] may have in the [e]state or property of . . . Moorer, including any and all interest as an heir at law or beneficiary of any will or trust created by [Moorer or his wife]." Id. at 374.

On February 4, 2014, King filed a motion asking the bankruptcy court to approve the settlement agreement. King argued in the motion that Scott's "claims concerning the . . . 2012 Will . . . [we]re property of the . . . bankruptcy estate since [Moorer] passed away on February 7, 2012." Id. at 131. King in turn argued that "the settlement [wa]s fair and reasonable, [and] in the best interest of the bankruptcy estate . . . ." Id. at 132. King elaborated on this point, arguing that the four factors outlined in In re Kopexa Realty Venture Co., 213 B.R. 1020, 1022 (BAP 10th Cir. 1997), supported the proposed settlement. App. at 132. Specifically, King argued that "there [wa]s little probability of success on the merits [of the probate contest] based upon his investigation of the [litigation] and the previous rejection of [similar] claims in other forums." Id. King

10

further argued that the probate contest was "complex[] and would be expensive and time consuming to pursue." Id. In addition, King asserted that "[t]he settlement amount was the product of arms-length negotiations . . . and represent[ed] a negotiated compromise of disputed factual and legal issues and . . . t[ook] into account the time value of the estate's claims even if the Will and Trust were held invalid and the will contest prevailed." Id.

Debtors filed a *pro se* objection to King's motion for approval of the settlement agreement. Debtors asserted a host of reasons why the settlement agreement should not be approved, including, in pertinent part, that Scott was "entitled to her full possible future inheritance, whatever and whenever that turns out to be, and [wa]s legally entitled to all of the excess after payments to any creditors who . . . properly validated their claims." Id. at 147. In addition, Debtors argued that King "ha[d] no legal authority . . . to squander, plunder, erode, or negotiate away . . . Scott's possible future assets." Id. Indeed, Debtors argued that King was "not acting to preserve and protect the possible future assets of the estate of . . . Scott," but rather "appear[ed] to be [a] willing accessor[y] to the crimes of [his] real clients," the defendants in the probate contest, "who [we]re making every grasping effort possible to avoid trial and prosecution . . . for the theft of . . . Scott's possible future inheritance." Id. at 148. At no point in their *pro se* objection, however, did Debtors cite to § 541(c)(2) or argue that they were entitled to the exception outlined therein.

Debtors subsequently retained counsel and filed another objection to King's motion for approval. In this second objection, Debtors argued that King's proposed

11

settlement figure was "preposterous" and "ridiculously low" because the actual value of the probate contest was "about 3.1 million dollars (the remainder interest in a trust) of which . . . Scott has a one-third interest." Id. at 578 (quotation marks and citation omitted).

On June 10, 2014, the bankruptcy court held an evidentiary hearing on King's motion for approval of the settlement. King presented testimony from Nicholas Mizell, the attorney for the defendants in the probate contest. "Mizell testified that the 2012 Will was drafted by [Moorer] and [his wife's] long-time attorney[,] who is highly regarded by the local wills and estates bar." Id. at 356. Mizell further testified that, "[b]ased on information garnered from the depositions of all parties present at the will-signing, . . . the 2012 Will was properly executed and notarized by [Moorer]." Id. In addition, Mizell "opined [that] it would be very hard to overcome the presumption under Florida law that [Moorer] was lucid at the time the 2012 Will was signed[,] despite the fact that he may have had a failing memory." Id. In support of this opinion, Mizell noted that "the 2012 Will left [Moorer's] entire estate to his wife of sixty years and did not make any material changes to the 1983 Will aside from brin[g]ing it current with changes in tax law." Id. Mizell also "explained that even if the 2012 Will was invalidated, the 1983 Will would control and the estate would not go into intestacy." Id. Lastly, Mizell opined that the probate contest was "in reality a fight between . . . Scott and her [m]other," and he noted that discovery in the probate contest "had revealed a number of vitriolic e-mails from . . . Scott to" her mother. Id.

12

Scott's attorney in the probate contest, Douglas Rankin, also testified at the evidentiary hearing and "conceded the fragile foundation of . . . Scott's position in the" probate contest. Id. In particular, Rankin "admitted there were a number of contingencies that must be met before . . . Scott could recover more than" her half-sister, including that "the 2012 Will would have to be revoked, then the presence of factors of dependent relative revocation would have to be met, and then the court would have to find that [her half-sister] was not a 'child' of [Moorer] under the 1983 Will." Id. (footnote omitted).

For his part, King testified that he was "reluctant to put . . . Scott on the stand in support of his case if forced to try the" probate contest. Id. at 358. King explained that "he did not believe that she would be an effective witness" because she had "made a number of untrue statements or omitted key information during her [C]hapter 7 case . . . ." Id. King also opined "that there was no appreciable difference between . . . Scott's position in the [probate contest] and" that of her half-sister. Id. at 359. Because the half-sister "settled with the Defendants for $100,000 through mediation," King "determined that the estate's settlement for the same amount was fair and reasonable." Id.

At the evidentiary hearing, the bankruptcy court expressly noted that during the course of the probate contest, "Scott filed over 60 complaints against various parties involved in the execution of the 2012 Will." Id. at 356. These included "complaints with the Florida bar against [Moorer's] attorney, . . . complaints with the Florida governor's office against the notary who notarized the 2012 Will," and "claims against the notary's

13

surety company." Id. All of those complaints, the bankruptcy court noted, were either denied or rejected.

On July 24, 2014, the bankruptcy court issued an order granting King's motion for approval of the settlement agreement. In doing so, the bankruptcy court applied the four factors outlined in Kopexa and noted that, because the money at issue was held in a trust and no creditors had objected to the settlement agreement, the outcome of the motion hinged on King's "chance of success on the merits [of the probate contest] and the complexity of th[at] litigation." Id. at 357. The bankruptcy court concluded that King "made a reasonable business judgment to enter [into] the Settlement Agreement" because "[h]e was faced with protracted litigation half-way across the country without any funds to proceed" and, "[m]ore importantly, his chances of winning at trial appear[ed] quite uncertain." Id. at 359. The settlement, the bankruptcy court noted, "provide[d] $100,000 to an otherwise asset-less estate without the necessity of [expending] significant time, effort and expense[] to pursue an unknown result in the [probate contest]." Id. Lastly, the bankruptcy court concluded that King "ha[d] fulfilled his statutory and fiduciary duty to the estate by maximizing the value of this asset . . . ." Id. Consequently, the bankruptcy court held, it would "not disturb that result." Id.

The bankruptcy court also found in its order approving the settlement agreement that the Debtors had "sought to perpetrate a fraud on the [bankruptcy court] and on their creditors," by which, "[h]ad they been successful, they would have deprived their creditors of any asset distribution . . . ." Id. at 360. As a result, the bankruptcy court

14

concluded that "in equity and good conscience, [it] c[ould not] permit the Debtors'

constant and continuing bad faith with respect to this matter to derail [King's] efforts on

behalf of their creditors." Id. at 361. Thus, the bankruptcy court concluded that, "[b]y

their bad faith conduct, the Debtors ha[d] forfeited the right to have their voices heard"

and would not be permitted to "claim that the [probate contest] ha[d] any higher value

than that of the Settlement Agreement." Id.

### *The BAP's affirmance*

On August 29, 2014, Debtors filed a *pro se* notice of appeal from the bankruptcy

court's order approving the settlement. On September 2, 2015, the BAP issued an

unpublished decision affirming the bankruptcy court's order. The BAP concluded that

Scott's interest in the probate contest, and in the Wills generally, was property of the

bankruptcy estate, and that the bankruptcy court did not abuse its discretion in approving

the settlement agreement.

Scott filed a notice of appeal from the BAP's order on September 15, 2015.

### II

Scott asserts a single issue on appeal: that the bankruptcy court lacked subject

matter jurisdiction under 28 U.S.C. § 1334(e)(1) to administer her interest in Moorer's

spendthrift trust because it was not an "asset of the estate" under 11 U.S.C. § 541(c)(2).

Although this appeal is from a decision by the BAP, we do not rely on the substance of its

order and instead conduct a plenary review of the bankruptcy court's decision. Mathai v.

Warren (In re Warren), 512 F.3d 1241, 1248 (10th Cir. 2008). More specifically, "we

15

treat the BAP as a subordinate appellate tribunal whose rulings are not entitled to any deference (although they certainly may be persuasive)." Id. As for the bankruptcy court's decision, "[w]e review matters of law de novo" and "factual findings . . . for clear error." Id.

A

The jurisdiction of a bankruptcy court is circumscribed by 28 U.S.C. § 1334. Of relevance here, § 1334 provides that "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction . . . of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate . . . ."[3] 28 U.S.C. § 1334(e)(1); see 28 U.S.C. § 157(a) ("Each district court may provide that any or all cases under title 11 . . . shall be referred to the bankruptcy judges for the district."). In short, § 1334(e)(1) affords a bankruptcy court with "exclusive [*in rem*] jurisdiction over a debtor's property, wherever located, and over the estate." Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (2004) (citing 28 U.S.C. § 1334(e)); see id. ("The discharge of a debt by a bankruptcy court is . . . an *in rem* proceeding.").

"The commencement of a" Chapter 7 bankruptcy case "creates an estate." 11 U.S.C. § 541(a). "Except as provided in subsections (b) and (c)(2) of" § 541, the estate includes "all legal or equitable interests of the debtor in property as of the commencement

---

[3] This latter category of property would include, for example, earnings on estate property and recoveries of property by a trustee or debtor-in-possession. See Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (2004).

16

of the case." Id. § 541(a)(1). Subsection (c)(2) states that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2). We have held that "[a] beneficial interest in an ordinary spendthrift trust would clearly qualify for the [§ 541(c)(2)] exemption if the state courts would hold that creditors could not reach the interest." Gladwell v. Harline (In re Harline), 950 F.2d 669, 670 (10th Cir. 1991); see 9 William L. Norton, Jr. & William L. Norton III, Norton Bankruptcy Law and Practice 3d § 175:31, Westlaw (database updated July 2016) (noting that subsection (c)(2) excludes spendthrift trusts from the estate, provided that they are recognized under applicable state law).

B

Scott argues that the bankruptcy court in this case "lacked subject matter jurisdiction to administer" what she describes as her "interest in her late father's spendthrift trust because that interest is excluded from the property of the estate pursuant to 11 U.S.C. § 541(c)(2)." Aplt. Br. at 9. As a result, Scott argues, "[t]he bankruptcy court exceeded [its] jurisdiction in approving the settlement between [King] and the other parties to the Florida litigation over Scott's interest in her late father's spendthrift trust." Id. We reject Scott's arguments for the reasons outlined below.

*The § 541(c)(2) exclusion is permissive*

King argues, and we agree, that "the exclusion of property from the bankruptcy estate under § 541(c)(2) is *permissive* rather than *mandatory*." Aplee. Br. at 18. As

17

previously discussed, § 541(a) limits the bankruptcy estate to "all legal or equitable interests of the debtor in property as of the commencement of the case[,] . . . [e]xcept as provided in subsections (b) and (c)(2) of . . . section [541]." 11 U.S.C. § 541(a)(1). But the exception outlined in subsection (c)(2) is worded in permissive rather than mandatory fashion. In particular, it states that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." Id. § 541(c)(2). The Ninth Circuit in Rains v. Flinn (In re Rains), 428 F.3d 893, 905 (9th Cir. 2005), has expressly recognized that this language is "permissive rather than mandatory," and the Supreme Court has also suggested as much in Patterson v. Shumate, 504 U.S. 753, 765 (1992) ("may be excluded"). Thus, we agree with King that it is a debtor's choice whether or not to include such an interest in the bankruptcy estate.

*Scott's interest in the spendthrift trust and her interest in the probate contest*

The settlement agreement entered into by King purports to encompass, and ultimately agrees to waive, both Scott's interest in the spendthrift trust created by Moorer as part of the 2012 Will and her interest in the probate contest challenging the validity of the 2012 Will. In her appeal to the BAP, Scott argued that neither of these interests were part of her bankruptcy estate. The BAP disagreed. Now, in this appeal, Scott appears to focus exclusively on the interest in the spendthrift trust. Out of an abundance of caution, we will address both of these interests.

To begin with, the record on appeal indicates that Moorer's 2012 Will does,

18

indeed, contain a spendthrift provision.  As we have noted, the 2012 Will provides that if

Moorer's wife "fails to exercise her limited power of appointment" prior to her death,

"any remaining trust principal in the Marital Trust will be disposed of pursuant to [the

provisions of] Moorer's Revocable Trust."  App. at 407.  Under the relevant provisions of

Moorer's Revocable Trust, the remaining trust principal would "be divided into two equal

shares" on behalf of Scott and her brother, if they are both living, "subject to the

provisions of . . . lifetime trust[s] to be established for [their] benefit . . . ."  Id. at 408.

"These lifetime trusts . . . are designed to be asset protection trusts for the benefit of"

Scott and her brother.  Id.  More specifically, they are designed "to insulate the assets

held in the children's trusts from a beneficiary's creditors to the fullest extent permitted

by law."  Id.  In sum, this is a spendthrift provision that is recognized as valid under

Florida state law.  Id.; see Zlatkiss v. All Am. Team Concepts, LLC, 125 So. 3d 953, 955

(Fla. Dist. Ct. App. 2013) (discussing spendthrift trusts, noting that they are recognized as

valid and enforceable under Florida statutes, and do not violate the Florida Constitution).

The question thus becomes whether the existence of this spendthrift provision

prevents Scott's interest in the 2012 Will from becoming part of her Chapter 7 bankruptcy

estate.  As we have explained, the type of interest that Scott has here, i.e., a beneficial

interest in a spendthrift trust that is recognized and protected by applicable state law,

would generally qualify for the § 541(c)(2) exception.  In other words, it typically would

not be considered part of the bankruptcy estate.

But, as we have also explained, the exception outlined in § 541(c)(2) is permissive

19

rather than mandatory, and thus it is a debtor's choice whether or not to include such an interest in his or her bankruptcy estate. And in this case, the record indicates that Scott effectively chose to include her interest in the 2012 Will as part of her estate. Specifically, she amended her Schedule B to include her interests in the pending probate proceeding and the related probate contest. Moreover, at no point during the proceedings before the bankruptcy court did she argue that she was entitled to the exception outlined in § 541(c)(2). Lastly, as King points out in his appellate briefing, until recently, Scott asserted that the 2012 Will was invalid and that her interest thereunder was essentially worthless. For all of these reasons, we reject Scott's claim of entitlement to the § 541(c)(2) exception, and affirm the bankruptcy court's conclusion that Scott's interest in the 2012 Will was part of her bankruptcy estate.

As for Scott's interest in the probate contest, it does not qualify for the exception outlined in § 541(c)(2). The probate contest is simply a cause of action that has some present value, whatever that may be, and is a distinct asset of its own. See generally Moratzka v. Morris (In re Senior Cottages of Am., LLC), 482 F.3d 997, 1001 (8th Cir. 2007) ("Causes of action are interests in property and are therefore included in the estate . . . ."); Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.), 84 F.3d 1281, 1285 (10th Cir. 1996) (same). And that cause of action, unlike the underlying legal instrument that it seeks to invoke (i.e., the 1983 Will), is not subject to any spendthrift provision. At most, the present value of this cause of action might be impacted by the existence of a spendthrift provision in the 1983 Will. Therefore, we conclude that the bankruptcy court

20

properly treated Scott's interest in the Florida probate contest as property of the Debtors' bankruptcy estate.

C

King has filed a motion for leave to file a surreply brief. In his motion, King asserts that Scott, in her appellate reply brief, is raising for the first time "an argument that the release of claims set forth in the Settlement Agreement entered into by [King] . . . should not have included any contingent interests she may have had in spendthrift trusts created under [Moorer's] estate planning documents." Mot. at 1. Although King is correct that Scott's opening brief did not mention King's authority to release her interest in the spendthrift trust created by the 2012 Will, she did argue that this very interest was not part of the estate and not within the bankruptcy court's jurisdiction. In other words, the argument that Scott makes in her appellate reply brief regarding King's lack of authority to settle is a necessary corollary to the key argument presented in her opening brief. Thus, it is not really a "new" argument, as King asserts. Consequently, we deny King's motion.

III

We DENY appellees' motion to file a surreply brief and AFFIRM the decision of the Bankruptcy Appellate Panel.

21