FILED
United States Court of Appeals
Tenth Circuit

February 24, 2021

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

VICTOR P. KEARNEY,

     Appellant,

v.

UNSECURED CREDITORS
COMMITTEE, KEVIN YEAROUT,
UNITED STATES TRUSTEE, and
LOUIS ABRUZZO and BENJAMIN
ABRUZZO, Trustees of the Mary Pat
Abruzzo Kearney Testamentary Trusts B
and C,

     Appellees.

No. 19-2209

_____

**Appeal from the Bankruptcy Appellate Panel**
**No. NM-19-010**
**(Bankr. No. 17-12274)**
_____

Stacy R. Obenhaus, Marcus A. Helt, Debbie E. Green, Foley & Lardner LLP, Dallas, Texas, for Appellant.

Thomas D. Walker and Chris W. Pierce, Walker & Associates, P.C., Albuquerque, New Mexico, for Official Committee of Unsecured Creditors; Paul M. Fish and Spencer L. Edelman, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, for Louis Abruzzo and Benjamin Abruzzo, as Trustees of the Mary Pat Abruzzo Kearney Testamentary Trusts B and C; and James Askew, Askew& White, LLC, Albuquerque, New Mexico, for Kevin Yearout.

Before **KELLY, SEYMOUR,** and **MATHESON,** Circuit Judges.

**SEYMOUR**, Circuit Judge.

Victor P. Kearney was the lifetime income beneficiary of two spendthrift trusts when he filed for bankruptcy in 2017. The United States Trustee's office appointed an unsecured creditors committee ("UCC") which proposed a reorganization plan contemplating a one-time trust distribution to pay off Mr. Kearney's debts. After a New Mexico state court modified the trusts to authorize the distribution, the bankruptcy court approved the plan. Mr. Kearney appealed. The Bankruptcy Appellate Panel ("BAP") of the Tenth Circuit concluded that the bankruptcy court did not deny Mr. Kearney due process, made no errors in its findings of fact, and did not abuse its discretion in settling Mr. Kearney's claims. *See In re Kearney*, No. NM-19-010, 2019 WL 6523171 (10th Cir. BAP Dec. 4, 2019). Mr. Kearney appeals that decision, arguing that using spendthrift trust assets to fund the reorganization plan violated the trusts' spendthrift provision and the law, and that approving the settlement of Mr. Kearney's claims amounted to an abuse of the bankruptcy court's discretion. Exercising jurisdiction pursuant to 28 U.S.C. § 158(d)(1), we affirm.

# I.

## Factual Background

### A. *The Trusts under Mary Pat Abruzzo's Last Will and Testament*

The facts of this case were set out by the bankruptcy court and the BAP as follows. Alvarado Realty Company ("ARCO"), owned by Benjamin and Pat Abruzzo, developed the Sandia Peak Ski Area and the Sandia Peak Tramway. ARCO is a closely held company that also owns the Santa Fe Ski Area and other real estate investments in New Mexico, Colorado, and Arizona. Mr. and Mrs. Abruzzo died in a plane crash in 1985 and their children—Louis, Benny, Richard, and Mary Pat—took over the management of the company.

Mary Pat married Victor Kearney in 1988, at the age of twenty-two. She passed away in 1997. Mary Pat's last will and testament conveyed her 18.5% ownership interest in ARCO to two spendthrift trusts (the "MPK Trusts" or "Trusts"), of which Mr. Kearney is the income beneficiary during his life. After he dies, Mary Pat's will distributes the Trusts' corpus to her siblings, Louis, Benny, and Richard, or their surviving issue.[1] Louis and Benny Abruzzo (the "Abruzzos") and Mr. Kearney were appointed as co-trustees ("Trustees").

---

[1] Richard Abruzzo passed away in December 2010 and left behind two minor children, Rico and Mary Pat, who are represented by their mother, Nancy Abruzzo.

## B. The New Mexico State Court Action

Between 1997 and 2013, the Trusts' distributions to Mr. Kearney grew by 800% and totaled about $16 million. Wanting more, Mr. Kearney sued the Abruzzos in New Mexico state court in 2013, alleging that ARCO's long-standing policy of distributing only 70% of its income and retaining 30% amounted to an illegal suppression of dividends and the breach by the Abruzzos of their fiduciary duties.[2] The Abruzzos countersued for breach of fiduciary duty, for modification of the trusts, and for other relief.

The first trial commenced in June 2015. In that proceeding, Mr. Kearney made his case to the jury for over five days and asked for more than $7 million in damages. Once he rested, the Abruzzos moved for a directed verdict. In granting it, the court noted that the "Abruzzos' efforts on behalf of ARCO [had] been extremely successful" and concluded that their success did "not translate into a starvation or a partiality on behalf of ARCO over and against the interest of either Mr. Kearney or the remainder beneficiaries." Aplt. App., vol. XX at 41 (modifications omitted). The court concluded that a reasonable jury could not award Mr. Kearney "damages of any particular amount, let alon[e] 7-some-odd million dollars." *Id.* The court also granted the Abruzzos' motion for litigation costs, awarding them $510,000 in attorneys' fees and $155,915.60 in taxes and costs.[3]

---

[2] Notably, ARCO's dividend policy was set before Mr. Kearney married Mary Pat and did not change after her death.

[3] Under N.M.S.A. § 46A-10-1004 (1987), a court can award costs and expenses in a proceeding involving the administration of a trust, "as justice and equity may require."

Mr. Kearney resigned as trustee on December 6, 2016. On April 7, 2017, the state court imposed a $100,000 sanction against Mr. Kearney to address his "affront to the integrity and processes of the Court . . . ." Aplt. App., vol. XXIII at 51. The court admonished Mr. Kearney for his lack of "credibility when testifying" and for his repeated violation of the court's confidentiality order and his discovery obligations. *See id.* at 48-51.

The court then held a bench trial to adjudicate the Abruzzos' counterclaims. The evidence showed that Mr. Kearney's conduct had resulted in a toxic relationship between him and the Abruzzos that made it "difficult or impossible for Louis Abruzzo or Benjamin Abruzzo to effectively serve as Trustee," "and that modification of the trust is appropriate under 46A-4-412 NMSA." *Id*. at 229. The court accordingly scheduled an evidentiary hearing on September 5, 2017 to appoint a successor trustee and to establish "directives for further administration of the Trust and its assets in a manner which will effectively protect all beneficiaries equally." *Id.* Mr. Kearney filed for bankruptcy mere days before that hearing and the bankruptcy court stayed the state court proceeding.

## C. The Bankruptcy Proceedings

Since 1997, the MPK Trusts have distributed about $800,000 a year to Mr. Kearney. Yet he managed to accumulate over $7 million in debts by the time he filed for Chapter 11 bankruptcy on September 1, 2017. It is apparent from the evidence in this case that Mr. Kearney's financial problems arise not from illness, accident, or bad luck, but from a pattern of his own bad choices. The UCC was appointed to negotiate with Mr. Kearney over the terms of a reorganization plan. Failing to agree on a joint plan, Mr. Kearney

5

proposed the first of seven plans on June 12, 2018. The UCC's competing plan (the "UCC

Plan" or "Plan"), filed on July 12, 2018, calls for the following actions:

> *First*, ARCO is to buy its shares from the Trusts for $12,571,799;
>
> *Second*, the Trustees will then pay $3 million to Mr. Kearney to pay his creditors; and
>
> *Third*, the Trusts will pay the IRS the $350,890.55 in taxes Mr. Kearney owes from his share of income.

Aplt. App., vol. XX at 44. These proposals have been called the "Three Actions" or the

"Three Issues." Under the Plan, the remaining Trust corpus of approximately $8 million

will continue to generate income to Mr. Kearney for his lifetime, and Mr. Kearney's legal

claims against the Abruzzos, ARCO, and others will be settled.

Mr. Kearney "reacted to the UCC Plan with outrage and threats," accusing many

people of breaching their fiduciary duties to him by pursing the UCC Plan. *Id.* Once again

he sued the Abruzzos in state court for breach of fiduciary duties.

On August 30, 2018, the Abruzzos filed a motion for relief from the bankruptcy

stay, seeking the bankruptcy court's permission to ask the state court to determine whether

the Trusts could be modified to allow the Three Actions. The bankruptcy court granted the

motion.[4] The state court held an evidentiary hearing on October 23, 2018, and a week later

ruled that the proposed Trusts' modifications were proper and consistent with New Mexico

---

[4] Once the bankruptcy court granted the Abruzzos' motion and after the state court had set a hearing date, Mr. Kearney unsuccessfully tried to remove the action to the Federal District Court for the District of New Mexico.

6

laws. *See generally*, Aplt. App., vol. XXIV at 265-80. The state court modified the Trusts "to allow the Trustees to make a one-time $3,000,000.00 distribution from principal to Mr. Kearney . . . ." in order to pay off his creditors.[5] *Id.* at 278.

Subsequently, the bankruptcy court moved forward with a vote by creditors on the plans: 71% of votes and 96% of the voting dollars voted against Mr. Kearney's plan, while 84% of votes and 97% of the voting dollars voted for the UCC Plan. Aplt. App., vol. XX at 48, n. 13. The bankruptcy court then confirmed the UCC Plan.

### D. Appeals

Mr. Kearney appealed to the BAP. He first claimed the bankruptcy court denied him due process by rejecting his seventh amended plan. *In re Kearney*, 2019 WL 6523171 at *3. The BAP disagreed because Mr. Kearney had not served notice of intent to file that plan until ten days before the hearing, which was less than the required twenty-eight-days. *Id.* at *4.

The BAP next dismissed Mr. Kearney's claims that the UCC Plan was not proposed in good faith and that it was proposed by means forbidden by law. *Id.* at *5. It brushed aside the argument that "allowing the state court to consider the Trust Modifications in effect removed the issue of good faith from the Bankruptcy Court's purview" because, as the BAP explained, Mr. Kearney had not alleged that the bankruptcy court's decision was in error. *Id.* The BAP also rejected Mr. Kearney's argument that the Plan was proposed by

---

[5] The state court denied Mr. Kearney's motion for reconsideration in an order filed on January 4, 2021. FRAP 28(j) Letter from Official Committee of Unsecured Creditors, et. al (Jan. 7, 2021).

7

means forbidden by law because, after the modifications, "the [UCC Plan] complied with New Mexico law and the applicable provisions of the Bankruptcy Code." *Id.*

Finally, the BAP dismissed Mr. Kearney's claim that the bankruptcy court erroneously analyzed the first and third of the four factors set forth in *In re Kopexa Realty Venture Co.,* 213 B.R. 1020, 1022 (10th Cir. BAP 1997), and abused its discretion in settling his legal claims. The *Kopexa* factors include the probable success of the underlying litigation on the merits, the possible difficulty in collection of a judgment, the complexity and expense of the litigation, and the interests of creditors in deference to their reasonable views. *Id.* As to the first factor, the BAP held the record supported the finding that Mr. Kearney's causes of action lacked merit because he did not prevail in his 2013 state court litigation and he was sanctioned for $100,000. *In re Kearney*, 2019 WL 6523171 at *8. As to the third factor, the bankruptcy court did not err in assessing the complexity and expense of litigation even though Mr. Kearney's representation was on a contingency basis. Pursuing the claims could still be costly because (1) Mr. Kearney was previously ordered to pay the opposing counsel's attorneys' fees as a sanction and (2) the contingency fee agreement required pre-judgment payments. *Id.*

On appeal before us, Mr. Kearney argues that the UCC Plan violates 11 U.S.C. § 1129(a)(3)'s requirements that a plan be "proposed in good faith and not by any means forbidden by law." He also maintains that the bankruptcy court abused its discretion by approving the settlement of Mr. Kearney's legal claims.

8

## II.

## Discussion

Although Mr. Kearney appeals the BAP's decision, "we do not rely on the substance of [BAP's] order and instead conduct a plenary review of the bankruptcy court's decision." *Amerson v. King* (*In re Amerson*), 839 F.3d 1290, 1298 (10th Cir. 2016) (quoting *Mathai v. Warren*, 512 F.3d 1241, 1248 (10th Cir. 2008)). "[W]e treat the BAP as a subordinate appellate tribunal whose rulings are not entitled to any deference (although they certainly may be persuasive)." *Id.*

### A. Violation of U.S.C. § 1129(a)(3)

Under 11 U.S.C. §1129(a)(3), "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." Mr. Kearney first contends the UCC Plan violates this provision, claiming the plan uses means forbidden by law and was not proposed in good faith. When reviewing confirmation of a settlement, we review the bankruptcy court's legal conclusions *de novo* and its underlying factual findings for clear error. *In re Paige*, 685 F.3d 1160, 1177 (10th Cir. 2012). A finding of fact is clearly erroneous if it lacks factual support in the record or if, after reviewing all the evidence, we are left with the firm conviction that a mistake has been made. *In re Ford*, 492 F.3d 1148, 1153 (10th Cir. 2007) (citation omitted).

#### 1. The UCC Plan was not proposed by means forbidden by law

Mr. Kearney argues that the UCC Plan as proposed violates the law because it "uses trust assets to pay creditors of the estate, contrary to the trusts' spendthrift provisions," and because the New Mexico Uniform Trust Code § 46A-5-502 (1978) prohibits attachment by

9

Mr. Kearney's creditors of his income or principal distributions from the spendthrift Trusts. Aplt. Br. at 19, 20-21. He reasons the $3 million distribution to pay off his creditors requires modifying the Trusts' spendthrift provision, which he claims the state court did not allow. *Id.* at 21. Under Mary Pat's last will and testament, the Trusts each include the following spendthrift provision:

> Except as otherwise provided herein, all payments of principal and income payable, or to become payable, to the beneficiary of any trust created hereunder shall not be subject to anticipation, assignment, pledge, sale or transfer in any manner, nor shall any said beneficiary have the power to anticipate or encumber such interest, nor shall such interest, while in the possession of my Executor or Trustee, be liable for, or subject to, the debts, contracts, obligations, liabilities or torts of any beneficiary.

Aplt. App., vol. XXIII at 73.

Section 541(a)(1) of the Bankruptcy Code incorporates into the bankruptcy estate, with some exceptions, "all legal or equitable interests of the debtor in property as of the commencement of the case." One such exception is set forth in Section 541(c)(2) of the Code, which provides that "[a] restriction on a transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2). "A beneficial interest in an ordinary spendthrift trust would clearly qualify for the exemption *if the state courts would hold that creditors could not reach the interest.*" *In re Harline*, 950 F.2d 669, 670 (10th Cir. 1991) (emphasis added). "Thus, to determine whether the Debtor's interests in the Trusts were excluded from his estate, we must analyze the nature of that interest, under applicable state law . . . ."

10

*In re Hilgers*, 279 F. App'x 662, 664-65 (10th Cir. 2008) (unpublished);[6] s*ee In re Neuton*, 922 F.2d 1379, 1383 (9th Cir. 1990) (including one-fourth of a spendthrift trust into a debtor's bankruptcy estate because state laws allowed payment out of a trust for which the debtor was a beneficiary, so long as the payment did not 'exceed[] 25% of the payment that otherwise would be made to . . . the beneficiary.'").

Here, Mr. Kearney contends the Three Actions at the heart of the UCC Plan violate section 541(c)(2)'s mandate to exclude his interest in the Trusts from his bankruptcy estate. We disagree because, according to the state court, the Three Actions were consistent with New Mexico laws.

As an initial matter, we are not persuaded by Mr. Kearney's argument that the UCC Plan was *proposed* by means forbidden by law because the state court had not yet modified the Trusts. As the UCC points out, its plan as proposed and as amended recognized not only the Trusts' spendthrift provision but also the state court's exclusive jurisdiction to determine whether the Trusts could be changed to effectuate the Three Actions.[7]

We also reject Mr. Kearney's position that the UCC Plan violates the Trusts' spendthrift provision even after the modifications. He concedes that the state court ordered

---

[6] We may cite unpublished opinions for their persuasive value pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[7] The first version of the UCC Plan, in pertinent parts, provided: "Upon Confirmation of the Plan, the automatic stay is modified to allow the State Court Litigation to proceed to permit the MPK Trustees to obtain approval of the ARCO Stock Redemption, approval of the Trust Payment, appointment of a Successor Trustee pursuant to the MPK Trust, approval of an amended Trust Agreement consistent with the foregoing . . . ." Aplt. App., vol. VII at 33. As amended, the Plan notes that the Abruzzos have obtained the state court's approval of the Three Actions. Aplt. App., vol. XV at 161.

a one-time $3 million distribution but says that money remains out of the creditors' reach because the Trusts' spendthrift provision was not *explicitly* modified. But the sequence of the events leading up to the approval of the UCC Plan as well as the state and bankruptcy courts' findings show the futility of his argument.

The process concluding with the approval of the UCC Plan establishes that the state court approved a one-time circumvention of the Trusts' spendthrift provisions. First, the Plan was equipped with a mechanism to obtain the state court's approval of the $3 million distribution to pay Mr. Kearney's creditors; second, the bankruptcy court triggered that mechanism by lifting the stay on the state court action; third, the state court, which was intimately familiar with the case[8] exercised its exclusive jurisdiction over the Trusts[9] and modified them to facilitate a $3 million distribution to pay Mr. Kearney's creditors; and fourth, the bankruptcy court relied on the modifications to confirm the UCC Plan. As this sequence illustrates, inherent in the state court's endorsement of the Three Actions was its permission to bypass the Trusts' spendthrift provision.

---

[8] As the bankruptcy court put it: "Judge Malott presided over the State Court Action for four years (2013-2017), took weeks of trial testimony, heard arguments of counsel, read many briefs and motions, and ruled on at least four motions for summary judgment. It is undisputed that Judge Malott has significant knowledge about and history with the parties, the MPK Trusts, and the disputes that were litigated in his court." Aplt. App., vol. XIII at 108.

[9] New Mexico law vests exclusive subject-matter jurisdiction in the state district courts for proceedings involving New Mexico trusts. *See* NMSA § 46A-2-203 (1978) ("The district court has exclusive jurisdiction of all proceedings involving a trust.").

Separately, the record belies Mr. Kearney's assertion that the $3 million distribution remains subject to the Trusts' spendthrift provision. When deciding the appropriateness of the Three Actions, the state court set forth the following facts:

> The payment by the Trustees of $3,000,000.00 from principal to Mr. Kearney, with him then being required to deliver it to the Creditor Trustee as proposed, is a proper action by the Trustees and is in accordance with their fiduciary duties to Mr. Kearney and to all beneficiaries.
> The Trusts should be modified to allow, on a one-time basis, the payment by the Trustees of the $3,000,000.00 from principal to Mr. Kearney as provided in the Three Actions.

Aplt. App., vol. XXIV at 277. The bankruptcy court adopted these facts. *See* Aplt. App., vol. XX at 47-48.

The state court also offered the following conclusions of law:

> *The transactions contemplated by "The Three Issues" are actions within the scope of the Trustees' powers and responsibilities as authorized by The MPK Testamentary Trust.*
> The transactions contemplated by "The Three Issues" are approved by the Court as appropriate and proper under the totality of the circumstances and are in the best interests of all the beneficiaries, including the remaindermen.
> The transactions contemplated by "The Three Issues" are not voidable transactions under Section 46A-8-802.
> *The MPK Testamentary Trusts should be modified, and hereby are so modified, to allow the Trustees to make a one-time $3,000,000.00 distribution from principal to Mr. Kearney, but only upon approval of the pending UCC Plan by the Bankruptcy Court.*
> . . .
> The actions of the Trustees contemplated in "The Three Issues" are within the powers and responsibilities of the Trustees under the terms of the trust document.
> . . .
> The Trusts are modified to permit the one-time distribution of $3,000,000.00 of principal to Mr. Kearney as contemplated by the UCC Plan.
> The distribution of the $3,000,000.00 to Mr. Kearney by the Trustees is proper and not a breach of their fiduciary duty.

13

> *The Trustees distribution of $3,000,000.00 from Trust principal to be paid to Mr. Kearney and then immediately over to the UCC is in keeping with the Trustee's powers and duties and is not a breach of same.*
>
> The Trustees' performance of the acts encompassed in "The Three Issues," and each of those actions, are proper and appropriate actions for them to take under the totality of the circumstances.
>
> *The Trusts are hereby modified to add a provision applicable to Trusts B and C which states as follows: The Trustees are authorized on a one-time basis to distribute $3 million of principal to Kearney if the UCC Plan is confirmed by a Final Order of the Bankruptcy Court.*

Aplt. App., vol. XXIV at 278-79 (emphasis added).

Despite these clear pronouncements, Mr. Kearney contends the state court did not *really* authorize the Three Actions because it did not explicitly modify the Trusts' spendthrift clause. But Mr. Kearney does not explain how to reconcile this position with the state court's explicit license to the Trustees to effectively pay Mr. Kearney's creditors with the Trusts' assets. How can the "Trusts [be] modified to permit the one-time distribution of $3,000,000.00 of principal to Mr. Kearney as contemplated by the UCC Plan" if the Trusts' spendthrift provision blocks it? How could that distribution be "a proper action by the Trustees" and simultaneously a breach of the Trusts' spendthrift provision? Mr. Kearney does not suggest an answer. Agreeing with Mr. Kearney would require interpreting the state court's words to mean the opposite of what they say in plain English. That we will not do. Instead, we uphold the bankruptcy court's finding that the state court's modifications of the Trusts enabled the Three Actions, including the distribution to Mr. Kearney's creditors, and therefore they do not violate the Trusts' spendthrift provision.

In sum, the bankruptcy court understood the state court's extensive finding of facts and conclusions of law to authorize bypassing of the Trusts' spendthrift provision to effectuate the Three Actions. That finding is amply supported by the record and therefore is not clearly erroneous.[10]

### 2. *UCC Plan Was Proposed in Good Faith*

Mr. Kearney next argues that the UCC Plan was not proposed in good faith as required by § 1129(a)(3). "Good faith for purposes of § 1129(a)(3) is ordinarily a finding of fact that we review for clear error." *In re Paige*, 685 F.3d at 1178.

Although the statute does not define good faith, "[c]ase law under the Code[] has tended to define the good-faith requirement as requiring only that there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Id.* (citation omitted). The Supreme Court teaches that "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

---

[10] It is noteworthy that despite Mr. Kearney's outrage about paying creditors from the Trusts, his own proposed chapter 11 plans envisioned a similar mechanism. *See, e.g.*, Aplt. App., vol. IV at 63 (stating "if [Kearney's] plan is approved, the Debtor may use a specified amount of money received from the MPK Trust to pay Allowed General Unsecured Claims . . . .").

Here, the bankruptcy court specifically found the Plan to be in Mr. Kearney's best interest:

> He will get a bankruptcy discharge. $3,000,000 will pay his debts of more than $8,600,000. He will no longer be able to waste time and money pursuing questionable litigation against his in-laws. He may be forced for a time into gainful employment, which might not be a bad thing. It is time for him to move on. While Debtor cannot see that, it is obvious to most others. After four years or so of reasonable belt-tightening, Debtor can live post-bankruptcy with a fresh start and the prospect of a healthy lifetime income most people would consider a godsend. The Plan was proposed and developed in good faith.

Aplt. App., vol. XX at 55. The bankruptcy court's finding of good faith is sound and complies with a central purpose of the Bankruptcy Code as explained in *Grogan*. As such, due deference to the court's well-reasoned conclusion compels us to affirm.[11]

In the final analysis, we are not persuaded that the UCC Plan was proposed in bad faith or by means prohibited by law. Mr. Kearney's arguments do not establish a clear error by the bankruptcy court but rather show "his mistaken belief that only he should be allowed to control the reorganization process, whatever the cost, delay, or acceptability of payment proposals." *Id.* at 79.

---

[11] We reject Mr. Kearney's argument that the UCC Plan was not proposed in good faith because it was "collusive," Aplt. Br. 42, and we do not share his concern that if we uphold the Plan "there is no limit to the schemes a creditor could concoct and employ in and out of bankruptcy to penetrate a spendthrift trust." *Id*. at 44. We do not foresee this funereal future because, as explained, inherent in the state court's changes to the Trusts was a license to bypass the Trusts' spendthrift provision. Accordingly, our decision here does not disturb this Circuit's precedent that generally exempt a spendthrift trust from a debtor's bankruptcy estate. *See In re Amerson*, 839 F.3d at 1300 ("a beneficial interest in a spendthrift trust that is recognized and protected by applicable state law, would generally qualify for the § 541(c)(2) exception. In other words, it typically would not be considered part of the bankruptcy estate.").

### B. *Approval of Settlement*

Mr. Kearney next argues the bankruptcy court erred in approving the settlements in the UCC Plan because (1) some of the claims are not property of the estate, (2) the court did not form an independent judgment as to the claims' merits, (3) the Plan lacked adequate consideration, and (4) the expense and complexity of the litigation weigh against settlement. The parties agree that we review the bankruptcy court's approval of the settlements for abuse of discretion. We review de novo whether an asset is property of the estate. *See In re Wise*, 346 F.3d 1239, 1241 (10th Cir. 2003).

In evaluating the UCC Plan's proposed settlements, the bankruptcy court analyzed the four factors set forth in *In re Kopexa Realty Venture Co.*, 213 B.R. at 1022: (1) the chance of success on the merits; (2) possible problems in collecting judgment; (3) the expense and complexity of the litigation; and (4) the interest of the creditors. The court determined that every factor except the second favored settlement, compelling the conclusion that "[o]verall, the *Kopexa* factors weigh heavily in favor of the settlement." Aplt. App., vol. XX at 52-53. Mr. Kearney disagrees with the bankruptcy court's analysis of the first and third factors.

We begin by noting that settlements are favored in bankruptcy. *In re S. Med. Arts Co., Inc.*, 343 B.R. 250, 255 (10th Cir. BAP 2006). But settlement should be approved only based on the informed and objective assessment of the facts in their totality. *In re Kopexa Realty Venture Co.*, 213 B.R. at 1022 (citing *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989)). A mini-trial on the matters under consideration is unnecessary; it is enough for the court to "canvass . . . 'the issues and see whether the settlement falls below

17

the lowest point in the range of reasonableness.'" *In re Dennett*, 449 B.R. 139, 145 (Bankr. D. Utah 2011). We affirm a bankruptcy court's approval of a settlement unless we find it either lacking in evidentiary support or disconnected to the evidence in the record. *Id.* at 144 (citations omitted).

### 1. *The settled claims are property of the estate*

As an initial matter, Mr. Kearney argues the bankruptcy court wrongly settled the following legal claims because they are not property of the estate: (1) his state court trust litigation and its appeal; (2) his lawsuit against the Abruzzos for breach of fiduciary duty in the bankruptcy proceedings and their proposal of the UCC Plan; and (3) his proposed double derivative litigation against the Abruzzos and ARCO for minority shareholder suppression. He maintains these legal claims are related to the Trusts, are not estate property, and therefore cannot be settled under the Plan. We disagree.

As referenced above, section 541(a)(1) of the Bankruptcy Code includes in the bankruptcy estate, with some exceptions, a debtor's property at the start of the proceeding, including his causes of action. *Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir. 1996) (citations omitted). Subsection (c)(2) gives a debtor the choice as to whether to include in the bankruptcy estate the debtor's beneficial interest in a trust that cannot otherwise be transferred under applicable nonbankruptcy law. *In re Amerson*, 839 F.3d at 1299 ("the exception outlined in subsection (c)(2) is worded in permissive . . . fashion" and gives the debtor the choice of "whether or not to include such an interest in the bankruptcy estate.").

In *In re Amerson*, a Chapter 7 trustee sought approval of a settlement agreement related to a debtor's interest in a spendthrift trust under her father's will and her interest in

18

a related probate contest. Although the debtor initially listed no assets under Schedule B to her petition, where she was required to list any interests in the estate of a decedent or a trust, she later amended that schedule to list her interest in the trust and the probate contest. *Id.* at 1293-94. The bankruptcy court approved the settlement over the debtor's objections. The debtor appealed, arguing that under 11 U.S.C. § 541(c)(2), the bankruptcy court lacked subject matter jurisdiction over her interest in the spendthrift trust or its related litigation. We disagreed. While recognizing that a debtor's beneficial interest in a spendthrift trust generally qualifies for that exclusion, we affirmed because the debtor had effectively chosen to incorporate that interest into her bankruptcy estate by referencing it in her petition. *Id.* at 1299.

Here, Mr. Kearney's amended reorganization plan defines "Assets" as "all assets of the Estate, including, without limitation, all property of the Estate pursuant to § 541 of the Bankruptcy Code, Cash (including the Sale Proceeds), *Causes of Action*, . . . ." Aplt. App., vol. X at 12. It then defines "Causes of Action" as:

> any and all unliquidated and contingent rights, claims, and causes and rights of action of the Estate, direct or indirect, derivative or non-derivative, including Avoidance Actions, that exist or may have existed as of the Petition Date, including, without limitation, any related to Louis Abruzzo, Benjamin Abruzzo, Nancy Abruzzo, Rico Abruzzo, Mary Pat Abruzzo, Alvarado Realty Company, the Abruzzo Litigation, any such rights, claims, causes of action, suits, and proceedings that the Debtor may have as debtor and debtor-in-possession (exercising the rights and powers of a trustee pursuant to § 1107(a) of the Bankruptcy Code), whether or not brought by or on behalf of the Debtor and/or the Estate, and/or any holder of any Claim, . . . .

*Id.* at 12-13. Further, Appendix 5 to that plan incorporates "a non-exclusive list of the Causes of Action and other similar claims, counterclaims, rights, defenses, setoffs,

recoupments, and actions in law or equity," including: Case No. D-202-CV-2013-07676, Mr. Kearney's lawsuit against the Abruzzos as trustees of the MPK Trusts; Adversary No. 18-01031-t, his lawsuit against the Abruzzos for "[a]voidance and recovery of preferential and fraudulent transfers, avoidance and recovery of unauthorized post-petition transfers, injunction against stay violations, [and] declaratory judgment"; and his potential lawsuit against ARCO and the Abruzzos for "shareholder oppression, breaches of controlling shareholders' fiduciary duties, unjust enrichment, and statutory violations." *Id.* at 64-66.

Mr. Kearney also demonstrated his belief that derivative claims against ARCO were property of the estate in his discovery motion before the bankruptcy court under Federal Rule of Bankruptcy Procedure 2004. In that motion, he sought to examine ARCO's corporate records. To justify the examination of those records, he argued that the "Debtor has the right to pursue these derivative claims on behalf of the Trusts in their role as ARCO shareholders" and "[a]ny recovery by the Trusts could ultimately benefit creditors in this case." Aplt. App., vol. III at 141. When ARCO objected to the motion, Mr. Kearney stated in response that "[t]he potential claims also belong to the Debtor's estate" because "Section 541 broadly defines the estate" and "[c]ourts have held that the right to bring a derivative claim is an asset of the estate." Supp. Aplt. App., vol. II at 20. By arguing that potential claims against ARCO were property of the estate for purposes of his reorganization plans and the Rule 2004 motion, Mr. Kearney "effectively chose" to include the potential causes of action against ARCO as part of his estate. *See Amerson*, 839 F.3d at 1300.

The UCC suggests an additional reason why the legal claims are property of the bankruptcy estate. As we have discussed, section 541(a)(1) of the Bankruptcy Code incorporates into the bankruptcy estate, with some exceptions, a debtor's entire property at the commencement of a proceeding. *Sender v. Simon*, 84 F.3d at 1305. In 2005, Congress temporally expanded the definition of estate property to include "all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted . . . ." 11 U.S.C.A. § 1115(a)(1). Against this backdrop, Mr. Kearney's incorporation of the legal claims in his bankruptcy plans shows they were developed before the close of the bankruptcy proceeding and thus are the property of the estate. *See also In re Amerson*, 839 F.3d at 1300 (holding that a cause of action is a distinct asset of its own and is included in a debtor's bankruptcy estate) (citing *Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 482 F.3d 997, 1001 (8th Cir. 2007), and *Sender v. Buchanan (In re Hedged–Invs. Assocs., Inc.)*, 84 F.3d 1281, 1285 (10th Cir. 1996)).

In sum, the bankruptcy court properly concluded that the legal claims are property of Mr. Kearney's bankruptcy estate.

### 2. *Mr. Kearney is not likely to succeed on his claims*

Mr. Kearney disagrees with the bankruptcy court's assessment of the first *Kopexa* factor: the chance of his various claims succeeding on the merits. In reaching its conclusion, the court recounted Mr. Kearney's failed litigations against the Abruzzos and ARCO that cost him millions in attorney fees, costs, and sanctions and concluded that Mr. Kearney is not a sympathetic plaintiff. Yet Mr. Kearney argues the court failed to "fulfill

21

its duty to form an 'intelligent and objective opinion of the probabilities of ultimate success

should the claim be litigated'" instead of settled, asserting the court's conclusion is

supported by "no evidence whatsoever." Aplt. Br. at 48-49. We disagree.

The bankruptcy court considered the vast universe of facts supporting the futility of

Mr. Kearney's lawsuits. First, it quoted the state court's finding about the Trustees' proper

conduct and Mr. Kearney's meritless theory of the case in his 2013 litigation:

> I don't find that the Abruzzos misused any control they may have had in this circumstance. The totality on which the entire Plaintiff's case rests is if it's good for ARCO, it must be bad for Victor Kearney. That's not the law; that's not the evidence in this case.
>
> The Abruzzos' efforts on behalf of ARCO have been extremely successful. The fact that the Abruzzos have run their company properly does not translate into a starvation or a partiality on behalf of ARCO over and against the interest of either Mr. Kearney or the remainder beneficiaries. The appropriate totality appears to be in this situation, a rising tide lifts all the boats.
>
> *Kearney has made an increased distribution of over 800 percent through one of the worst recessions this country has ever seen.* The Abruzzos do not control the board. There is not a single incident in which it was shown they had their way or forced their agenda onto anyone else.
>
> *The fact that ARCO has grown as large over these last 15 years has made the whole pie bigger and everybody's slice bigger. How that could translate to a reasonable jury into an award of damages of any particular amount, let alon[e] 7- some-odd million dollars, does not compute to the Court.*

Aplt. App., vol. XX at 40-41 (emphasis added) (modifications omitted).

The bankruptcy court also relied on the state court's opinion granting the Abruzzos'

motion for attorney's fees and costs:

> Plaintiff argues that Defendants should not be allowed to recover fees incurred in Defendants' opposition to his attempts to obtain corporate documents and information from ARCO, the separate, closely held, corporation involved in this matter but not a party hereto. A *significant pillar of Plaintiff's case was his claim that his status as a Trustee and Life Income Beneficiary under his deceased wife's Trust entitled him to effect [sic] the*

*management of ARCO from which the Trust's income flows. Another pillar was his claim that Defendants operated ARCO so as to profit ARCO more than the Trust and, therefore, to minimize income to Plaintiff. . . [H]e was not successful in establishing his core charges that Defendants managed ARCO to his financial detriment.* The fees incurred in context of the ARCO document discovery dispute are a reasonable and necessary part of this overall litigation.

*[I]t is also indisputable that Plaintiff was, after two (2) years of litigation, not able to support his allegations with substantial evidence at trial. While Plaintiff believes he "had legitimate claims against the Defendants" which "survived vigorous summary judgment motions" Plaintiff could not, and did not, prove those claims at trial.*

*Id.* at 41-42 (emphasis added) (modifications omitted).

Finally, in sanctioning Mr. Kearney, the bankruptcy court quoted from the state court's "extensive findings and conclusions" that condemned Mr. Kearney for failing to appear for cross-examination after testifying at trial, for his repeated violation of the court's confidentiality orders, for his repeated breach of his trustee duties, for his "significant credibility issues," for his failure to mediate in good faith, and for poisoning his relationship with the Abruzzos. *Id.* at 42-43. The bankruptcy court concluded:

> The Court finds the Debtor has little chance of obtaining any substantial net recovery through continued litigation. To date, his claims against the Abruzzos and ARCO have cost him nearly two million dollars in attorney fees, costs, and sanctions. He is not a sympathetic plaintiff. The evidence presented in his first trial supports Judge Malott's finding that neither ARCO nor the Abruzzos breached any duties to him, the MPK Trusts, or any other party. Debtor's first, best chance for a litigation recovery was in his first lawsuit; he lost badly.

*Id.* at 52. The bankruptcy court's exhaustive explanations bely Mr. Kearney's accusation that its conclusion was based on "no evidence whatsoever."

Mr. Kearney also attacks the bankruptcy court's finding that "[h]e is not a sympathetic plaintiff," saying the court made this erroneous finding "[b]ecause it had no evidence before it that Kearney's claims are without merit . . . ." Aplt. Br. at 50-51. To the

23

contrary, the record is replete with evidence of Mr. Kearney's obnoxious conduct supporting that finding, including his misconduct with respect to the Trusts, his credibility issues, his contempt for the courts and the judicial process, and his appalling litigation habits.

i.

Mr. Kearney has long complained that the Abruzzos breached their fiduciary duties to him and colluded with the UCC to harm the Trusts. Yet, the evidence shows that his own wrongdoings, both as trustee and since his resignation, pose the most direct threat to the Trusts.

First, Mr. Kearney has time and again undermined the Trusts' spendthrift provision. For example, he promised to pay his largest creditor, Kevin Yearout, first from monies he receives from the Trusts. He also pledged to "take any necessary actions, including authorizing charging Orders against the Mary Pat Abruzzo Kearney Trust, to protect and further Yearout's security as Kearney's creditor . . . ." *Id.* Additionally, he repeatedly asked the Abruzzos to lend him money secured by his future distributions.[12] Aplt. App., vol. XXIII at 224.

Second, Mr. Kearney has acted in brazen contradiction to Mary Pat's ardent wish to keep the shares of ARCO with her family. For example, he conspired with third parties to forcefully take over ARCO and to liquidate its "Trophy Properties." *Id.* at 225-27. He

---

[12] For example, Mr. Kearney asked the Abruzzos for a $150,000 loan in 2005 and a $8,500,000 loan in 2011.

provided ARCO's confidential financial and proprietary information to Mr. Yearout and others, who in turn distributed some or all that information to over two dozen other persons and entities. *Id.* at 225. Also, in violation of the state court's confidentiality order, Mr. Kearney gave his expert's classified report to Mr. Yearout to help negotiate for the sale of the Trusts' assets.[13] *Id.* He then signed a series of documents to give the appearance that Mr. Yearout had control over the Trusts' shares of ARCO, including a document delegating Mr. Kearney's right to vote the Trusts' shares in ARCO.[14] *Id.* at 226. If successful, Mr. Kearney's $2 million debt to Mr. Yearout would have been converted to equity in ARCO. *Id.* at 227.

Third, Mr. Kearney has time and again reneged on his promises to pay income taxes despite knowing that nonpayment could force liabilities on the Trusts. *Id.* at 228. For example, despite his written pledges to file and pay the taxes, Mr. Kearney did not file any tax returns with New Mexico between 2008 and 2015, making him responsible for "$7 million in unreported income to answer for." *Id.* His tax liabilities posed a direct risk to the Trusts and the remainder beneficiaries' interests. *Id.* at 228-29.

This sampling of Mr. Kearney's unsavory conduct underscores his refusal to act responsibly and illustrates his contempt for the Trusts' governing provisions, Mary Pat's wishes, and the remainder beneficiaries' interest.

---

[13] While Mr. Kearney was conspiring to help third parties like Mr. Yearout to take over ARCO, Mr. Kearney was fully aware of their plans to substantially change ARCO's operations and to liquidate its "Trophy Properties." Aplt. App., vol. XXIII at 227.

[14] The terms of the delegation obligated Mr. Yearout to act in Mr. Kearney's best interest, not those of all beneficiaries.

### ii.

As previewed, Mr. Kearney also has significant credibility issues and seems comfortable lying under oath and otherwise. After conducting a 5-day jury trial, the state court found that Mr. Kearney "had little or no credibility" when testifying before the court. Aplt. App., vol. XXIII at 50.

Examples of Mr. Kearney's dishonesty include signing off on disclosure of protected information as "Trustee" a week after resigning from that position, *id.* at 49-50, and falsely alleging diversity of citizenship to remove the state action on Trust modifications to the federal district court, Aplt. App., vol. XXVI at 280-82. Furthermore, despite indicating in open court his willingness to mediate with the Abruzzos, Mr. Kearney secretly promised third parties not to resolve his legal disputes at that mediation in order to help them acquire the Trusts' ARCO shares. Aplt. App., vol. XXIII at 231.

As such, "Mr. Kearney has impressed the Court as an individual who bears no allegiance to the truth, but who will say whatever he thinks will achieve his goals." *Id.* at 50. Indeed, Mr. Kearney's many lies suggest that he has an ever-decreasing believability reserve that continues to dwindle at every encounter with the judicial system, making him an unsympathetic plaintiff and supporting the bankruptcy court's conclusion that he was not likely to succeed in further litigation.

### iii.

Mr. Kearney also has a well-established disdain for courts and the judicial processes which, unsurprisingly, is not promising for his prospect as a plaintiff. As commented by the state court, "[b]oth the frequency and level of Mr. Kearney's misbehavior make [even]

26

severe sanctions appear well deserved and appropriate." Aplt. App., vol. XXIII at 51. His

actions have continued to be an affront to "the entire judicial process." *Id.* at 50.

In his first lawsuit against the Abruzzos, for example, Mr. Kearney "repeatedly

exhibited bad faith non-compliance with his discovery obligations throughout [the]

litigation both generally and by failing to comply with specific discovery orders." *Id.* He

also regularly violated lawful state court orders by distributing ARCO's protected

information to third parties. When confronted, he claimed his actions were allowed under

the order, which the court "adamantly reject[ed]." *See id.* Instead, "Mr. Kearney released

the protected confidential information . . . for the primary if not sole purpose of furthering

his agenda to gain control of ARCO." *Id.*

Furthermore, as referenced above, after an unsuccessful mediation attempt in 2016

it was revealed that Mr. Kearney had entered the mediation having already promised third

parties that he would not settle his claims against the Abruzzos. Because of his antics, he

was ordered to bear the full costs of that failed mediation.

He also demonstrated his disrespect for the state court during his first trial when he

testified in his case-in-chief but refused to show up for his scheduled cross-examination.

Although he used the pretext of an unexpected medical condition, the court remained

doubtful of his true motives because he never substantiated his excuse.

Moreover, after the bankruptcy court granted the Abruzzos' motion to allow the

state court to determine the lawfulness of the Three Actions, and after the state court

scheduled a hearing, Mr. Kearney removed the action to federal court, falsely claiming

27

diversity of citizenship. The federal district court promptly remanded the action, explaining:

> Kearney's diversity allegations are frivolous. The notice of removal claims, for the first time, that Kearney is a Nevada citizen. However, he filed the original lawsuit against the Abruzzos in New Mexico's Second Judicial District Court in 2013 and the New Mexico bankruptcy case in 2017. . . .
>
> Kearney's attempt to remove the actions directly to this Federal District Court appears to be a sham litigation tactic to avoid a ruling by the Bankruptcy Court.

Aplt. App., vol. XXVI at 281-82. Mr. Kearney had also used an Albuquerque address when filing his then most recent monthly operating report in the bankruptcy proceeding.

There is more. Back at the bankruptcy court, Mr. Kearney spearheaded improper contacts with the UCC members to take control of the UCC and force the withdrawal of its Plan. Even his own counsel condemned this "skullduggery." Aplt. App., vol. XX at 84-85. Another time, the court expressed concern that Mr. Kearney filed a Bankruptcy Rule 2004 motion[15] to harass the Abruzzos and ARCO and surmised that Mr. Kearney's requests were "motivated by a vendetta." Aplt. App., vol. XIII at 14, 16.

Mr. Kearney's contempt for the judicial process reached its zenith when he tried to avoid complying with the bankruptcy court's order to pay professional fees by emptying his bank account. Because Mr. Kearney refused to pay professional fees throughout his bankruptcy proceeding, the UCC filed a motion on November 14, 2018 to order him to pay, which the court granted. Mr. Kearney refused to pay, claiming he did not have the money. But, evidence produced at a later hearing showed that immediately after the UCC

---

[15] Federal Rules of Bankruptcy Procedure Rule 2004 allows any party in interest to ask the court to order the examination of any entity.

filed its motion, Mr. Kearney transferred $153,511.88 out of his account—including a $60,306 transfer to his ex-wife. Aplt. App., vol. XX at 85. All told, in the three-week period between the UCC's motion and the Court's order, Mr. Kearney reduced his account balance from $173,000 to $16,700 to avoid paying his obligations. *Id.*

In sum, Mr. Kearney's established contempt for the judicial system and courts does not bode well for his litigations. His skullduggery not only diminishes his chances of future success as a plaintiff, but also exposes him and the Trusts to further sanctions.

iv.

Finally, Mr. Kearney's demonstrated litigious approach over the years undermines his claim that he is likely to succeed in his future litigation. The courts before us have commented on Mr. Kearney's seemingly obsessive desire to sue. His conduct compelled the state court to conclude that Mr. Kearney had brought that action without an honest belief in its merits:

> The evidence which has developed in this matter since June 2015 is clear and convincing that Mr. Kearney initiated this litigation with the purpose of damaging the Abruzzos individually and to foster his apparent plan to force a hostile takeover of the Abruzzo interests and the assets of ARCO by gaining access to financial and in-house information and documentation through discovery which he could not have accessed otherwise, and then disseminating such information to third parties in repeated violation of the Court's Orders and admonishments and in spite of significant monetary sanctions.

Aplt. App., vol. XV at 129.

The state court's final pretrial order reprimanded Mr. Kearney for his lawsuits, saying his "reckless and unfair actions" have harmed the Trusts and the interests of the remainder beneficiaries. Aplt. App., vol. XXIII at 189. The court further noted that Mr.

29

Kearney has engaged in "protracted, very expensive, and ever more desperate litigation that shows no sign of waning in view of the list of Mr. Kearney's intended lawsuits filed in the Bankruptcy matter." Aplt. App., vol. XXIV at 271.

Mr. Kearney's repeated failure to substantiate his numerous claims has not convinced him to stop; he wants to sue fifty persons and entities, including the Abruzzos, their family members, and the attorneys opposing Mr. Kearney in the bankruptcy proceeding. *Id.* at 272. The list of "nonexclusive" causes of action Mr. Kearney wants to prosecute includes:

> unfair practices acts, loan sharking, violations of protective order, aiding and abetting breach of fiduciary duty, fraud when Louis Abruzzo was not a trustee, numerous bankruptcy law violations, unjust enrichment, shareholder oppression, 'statutory violations,' quasi contract claims, constructive eviction, tortious interference, conversion, trade-secret misappropriation, breach of warranty claims, suit on sworn account, usury, libel, slander, malicious prosecution, premises liability, fraudulent transfers, conspiracy, aiding and abetting, defamation, improper assignment, unconscionability, wrongful set off, and violations of statutes and regulations 'to name a few.'

*Id.* at 271-72. To this partial list, Mr. Kearney has added "any claims or causes of action related to any matter." *Id.*

Against this backdrop, it is not surprising that Mr. Kearney has labeled proceeds from litigations his "bankruptcy estate's most valuable asset," saying they represent "the best opportunity for a meaningful recovery to creditors." Aplt. App., vol. XIII at 15. Indeed, the cornerstone of Mr. Kearney's reorganization plans appear to be endless litigations.

In sum, Mr. Kearney has shown a tendency to exploit the judicial system as a club to beleaguer anyone who stands in his way. His litigiousness threatens the integrity of the

30

courts and undermine his chances of success in pursuing future litigations. *See Gharb v. Mitsubishi Elec. Corp.*, 148 F. Supp. 3d 44, 55 (D.D.C. 2015) (discussing injunctive remedies against a litigious plaintiff to "protect the integrity of the courts and the orderly and expeditious administration of justice."); *Bradshaw v. Zoological* Soc'y *of San Diego*, 844 F.2d 791 (9th Cir. 1988) (unpublished) (describing the financial burden of a defendant's successful defense against the meritless claims of a litigious plaintiff as "miscarriage of justice."); *Pondexter v. Allegheny Cnty.*, C.A. No. 11-857, 2011 WL 5328562 at *4 (W.D. Pa. Nov. 4, 2011) (explaining that some courts "have enjoined overly litigious plaintiffs from filing actions involving 'groundless and vexatious litigation.'").

v.

Although any one of the above-referenced facets of Mr. Kearney's conduct—his abuse of the Trusts, his incessant lies, his mockery of the judicial system, or his litigious approach—may be enough to render him unsympathetic, their collective force surely depicts Mr. Kearney as a plaintiff interested only in his own short-term gains. They give ample support for the bankruptcy court's finding that Mr. Kearney "is not a sympathetic plaintiff."[16]

---

[16] We note, in the abundance of caution, that our analysis here is not a comment on the merits of any future lawsuits. It is intended to demonstrate only that the bankruptcy court's finding that Mr. Kearney is not a sympathetic plaintiff is supported by the record.

### 3. *The settlements are backed by consideration*

Mr. Kearney says the bankruptcy court's finding that the proposed settlement is supported by adequate consideration is clearly erroneous because "ARCO suffers no detriment on account of this transaction." Aplt. Br. at 52. We are not persuaded.

The bankruptcy court found enough consideration to approve the Plan because, among other things, in "exchange for the releases, ARCO is borrowing money, redeeming $12.6 million of its stock, and releasing its claim against [Mr. Kearney]." Aplt. App., vol. XX at 88. As the UCC points out, ARCO must pay interest on any money it borrows and paying the Trusts $12.6 million to purchase its stock precludes ARCO from engaging in other investment opportunities. Therefore, the bankruptcy court's finding of adequate consideration is not clearly erroneous.

### 4. *The expense and complexity of litigations favor settlement*

Mr. Kearney next disagrees with the bankruptcy court's finding that the third *Kopexa* factor, expense and complexity of litigation, weighs in favor of settlement. On that issue, the bankruptcy court offered the following analysis:

> The litigation Debtor wishes to bring against the Abruzzos, ARCO, and others would be expensive, even though Debtor's new law firm would take the case on a contingent fee. In the State Court Action, Debtor had to pay his counsel (which he has yet to do), the Abruzzos' counsel, costs, and a $100,000 sanction.

*Id.* at 87.

Mr. Kearney does not contend that his litigations will be simple or inexpensive. Instead, he relies on *In re C.R. Stone Concrete Contractors*, 346 B.R. 32 (Bankr. D. Mass. 2006), to argue that the court conducted its analysis incorrectly given the contingency

nature of his legal representation. Commenting on the court's decision, he says "[t]he law is to the contrary." Aplt. Br. at 55.

*In re C.R. Stone Concrete Contractors* is factually inapposite and is not even persuasive. In that case, the bankruptcy court relied on the fact that the contingent basis of representation "remove[d] any burden upon the estate." 346 B.R. at 50. But here, Mr. Kearney has not pointed to any evidence that litigation will not impose "any" burden on the bankruptcy estate. To the contrary, as the BAP noted, Mr. Kearney's "contingency fee agreement provided counsel would seek reimbursement of costs and expenses from [Mr. Kearney] periodically during the litigation, requiring pre-judgment payment." *In re Kearney*, 2019 WL 6523171 at *8.

Moreover, the record supports the conclusion that Mr. Kearney's lawsuits are likely to be expensive regardless of his contingency representation. As the bankruptcy court noted, Mr. Kearney has so far had to pay not only his opponents' litigation costs, but also a six-figure sanction. And nothing in the record suggests that Mr. Kearney has changed his litigious approach or his less-than-honest tactics that resulted in sanctions. For these reasons, the bankruptcy court's finding that the expense and complexity of the litigation favor settlement is amply supported by the record.

## C. Public Policy

Mr. Kearney's final argument is that public policy militates against approving the settlement because "The UCC Plan settlement—an agreement between creditors and trustees designed to avoid spendthrift trust restrictions—contravenes public policy." Aplt. Br. at 56. Here again, Mr. Kearney taps into his brief's underlying theme that the UCC

33

Plan violates the Trusts' spendthrift provisions. Having debunked that myth at length, we are unpersuaded.

## D. Conclusion

The UCC Plan was sufficiently considered and properly confirmed by the bankruptcy court. Accordingly, we affirm.